[No. 29431. *En Banc.* April 13, 1945.]

HENRY BRODERICK, INC., *Appellant*, v. E. B. RILEY, *as Commissioner of Unemployment Compensation and Placement, Respondent.*[1]

[1]Reported in 157 P. (2d) 954.

*Eggerman, Rosling & Williams,* for appellant.

*The Attorney General* and *George W. Wilkins, Assistant,* for respondent.

JEFFERS, J.—This proceeding was instituted by the department of unemployment compensation and placement against Henry Broderick, Inc., on April 13, 1943, by the service on that date of an order and notice of assessment demanding payment from Henry Broderick, Inc., of the sum of $4,129.07, as delinquent contributions due the unemployment compensation fund for the period of March 16, 1937, to and including March 31, 1943.

As stated in the brief of the commissioner of unemployment compensation and placement, such contributions were assessed on the contention of the commissioner that certain real estate brokers were performing services which constituted "employment" for Henry Broderick, Inc., and that the corporation was liable for contributions based on commissions earned by such brokers.

Henry Broderick, Inc., hereinafter referred to as appellant, filed a petition asking for a hearing on such assessment, stating and contending that such brokers are not in "employment" of appellant, but are co-principals with appellant in joint adventures in the rental, lease, or sale of real estate. The matter came on for hearing before the appeal tribunal, which thereafter made and entered its findings of fact, conclusions of law, and decision. The appeal tribunal concluded that the brokers here involved are performing services for appellant for wages as that term is defined in Rem. Rev. Stat. (Sup.), § 9998-119 [P. C. § 6233-317] (m), (now Rem. Supp. 1943, § 9998-119m), and must be considered in employment subject to the act unless it is shown that they are exempt because of the exceptions con-

tained in Rem. Rev. Stat. (Sup.), § 9998-119 (g) (5), (now Rem. Supp. 1943, § 9998-119g (5)).

The tribunal further found that appellant had failed to establish that the services of the brokers come within any of the exemptions contained in the subsection last above referred to; that their services constitute "employment" under the act, and "that contributions are properly assessable on the remuneration payable to them for the period in question."

Appellant thereafter filed its petition for review by the commissioner, alleging that the appeal tribunal's findings of fact are not complete, and that its conclusions of law are not supported by the evidence and are contrary to law. Appellant's argument in support of the petition is attached to the petition and by reference made a part thereof.

On October 13, 1943, the commissioner made and entered his decision, wherein he adopted the findings of fact and conclusions of law of the appeal tribunal and affirmed its decision. An appeal was taken to the superior court for King county, which court, after a review of the record and after hearing argument, entered judgment affirming the decision of the commissioner. From the judgment entered on May 6, 1944, Henry Broderick, Inc., has taken an appeal to this court.

It is contended that the court erred in sustaining the decision of the commissioner that the service constituted "employment" within the meaning of the act; in determining that the commissioner correctly construed the law and that his determination was neither arbitrary nor capricious; in determining that appellant failed to meet the requirements of Rem. Supp. 1943, § 9998-119g (5), (i) and (ii); and in rendering judgment for respondent and against appellant in the sum of $4,129.09, interest and costs, or in any sum.

The evidence in this case is not disputed, and all comes from witnesses called, and exhibits introduced, by appellant.

Henry Broderick has lived in Seattle forty-two years. He began business for himself in 1908, and appellant was incorporated by him in 1911. Appellant is a licensed real estate broker, and is engaged in many activities in connection with

the management, rental, leasing, and sale of real estate. Appellant also has an insurance department. It has been continuously engaged in the real estate business in Seattle for about thirty-five years.

Appellant has in its employ six real estate salesmen, who are directly under the supervision of Mr. Baird, vice-president. Mr. Baird's specific duties pertain to supervising the property management department. A part of the duties of the salesmen consists of looking after the property which appellant manages, of renting space, collecting rents, and supervising maintenance work. These salesmen each have a salesman's license procured from the state. Appellant pays for the procuring of such licenses, and pays the premium on the bond required by the state. Appellant holds sales meetings every morning, and the salesmen are required to attend. They report on their activities for the previous day and report on assignments which they have been given. The salesmen are under the direct supervision and control of appellant, the same as a bookkeeper or any other employee. They devote about twenty-five per cent of their time to sales activities and seventy-five per cent to property management. In so far as their connection with sales is concerned, if they are assigned to a prospect they are required to call upon him and report back to appellant. They pay no part of the sales expense in connection with any sale they may make or attempt to make.

The salesmen are paid a stipulated salary semimonthly, and in addition, if they have been responsible for a sale from which a commission comes to appellant, they receive a bonus of forty per cent of such commission, which commission is paid at the same time the salary is paid. Any commission coming to appellant by reason of the activities of the salesmen, goes directly into the profit and loss account of appellant. The salesmen receive a salary whether they make a sale or not. It is admitted that these salesmen are in "employment" under the act, and the evidence above set out was introduced for the purpose of contrasting the relation between appellant and its salesmen, and its relation with the real estate brokers involved in this proceeding.

It appears from the testimony of Henry Broderick that, from the time he began operations as an individual, and since the organization of appellant, the same association has been maintained with other brokers as has been maintained with the brokers here involved.

In 1938, appellant had a written contract prepared (App. Ex. 1), and thereafter any broker associated with appellant was required to sign this contract. This contract, according to Mr. Enge, treasurer of appellant, embodied exactly the same relationship that had existed between appellant and associate brokers, and was not intended to establish a different relationship between appellant and associate brokers, but to clarify the association to third parties who might for some reason be interested in what the association between appellant and these brokers was.

The contract in part provides that the parties respectively warrant that they are licensed and authorized to act as real estate brokers in the state of Washington, and each agrees that during the term thereof he will keep his license as a broker in full force and effect at his own expense, and will pay all fees and taxes due the state, county, or municipality arising out of his activities as broker, and neither shall be liable for the fees or taxes of the other. Failure on the part of either party to keep in effect his license as a broker, shall automatically terminate the agreement.

It is agreed that first party (appellant) is duly qualified to and does procure the listing of real estate for sale, lease, or rental, and prospective purchasers, lessees, and renters therefor, and has and enjoys the good will of, and a reputation for fair dealing with, the public. First party also has and maintains an office properly equipped with furnishings and staff, suitable to serving the public as a real estate broker, and the parties deem it to be to their mutual advantage to form the association agreed to. First party agrees to furnish second party a desk, with use of a telephone, at first party's offices now located at Second and Cherry street, and to furnish switchboard service, including taking of calls for second party pertaining to the services referred to. First party will also furnish second party with

such reasonable and necessary stenographic service as may be required for carrying out second party's portion of the agreement. It is understood that first party advertises extensively, and that second party will, at first party's discretion, be mentioned in such advertising.

First party agrees to make available to second party all current listings of the office, except such as first party may find expedient to place exclusively in the temporary possession of some other broker, and first party agrees to assist second party in his work by advice and full co-operation in every way practicable. First party has within its organization experts in various fields pertaining to real estate, and second party will have the benefit of the advice and co-operation of such experts in connection with deals being handled by second party.

Second party agrees to work diligently, and to exert his best efforts to sell, lease, or rent any and all real estate listed with first party and available to second party under the terms of the preceding paragraph, to solicit additional listings and customers in the name of first party, and otherwise to promote the business of serving the public in real estate transactions, to the end that each of the parties may derive the greatest profit possible. The usual and customary commission shall be charged for any service performed under the contract, unless first party shall advise second party of any special contract relating to any particular transaction which he undertakes to handle.

When second party shall perform any service whereby a commission is earned, such commission shall, when collected, be divided between first party and second party. First party shall receive fifty per cent and second party fifty per cent of the commission realized by them on deals in which second party has participated, division of the commission to be made on that basis as the commission is received. Such division shall apply also to fees on appraisals. In the event of special arrangements with any client, or in the event property of first party is listed, a special rate of commission may apply, such rate to be agreed upon by first party and second party. In no case shall first party be liable to second

party for any commission unless the same shall have been collected from the party *for whom the service was performed.*

First party shall not be liable to second party for any expense incurred by the latter, or for any of the latter's acts or omissions nor shall second party be liable to first party for office help or expense in so far as first party has agreed to provide the same, and second party shall have no authority to bind first party by any promise or representation, unless specifically authorized in a particular transaction; but expenses for attorney's fees, costs, revenue stamps, abstracts, and the like, which must by reason of some necessity be paid from the commission, or which are incurred in the collection of, or the attempt to collect, the commission, shall be paid by the parties in the same proportion as provided for in the division of commissions. First party shall be under no obligation to second party to make any advances either for expenses or commissions. Second party agrees to furnish transportation at his expense for prospects which second party contacts under this agreement, and to pay *at his own expense entertainment costs, club dues, and other expenses incident to the conduct of his services as a real estate broker.*

*Second party shall have entire discretion as to the handling of "leads" and prospects assigned to him, as to the conduct of second party's services as broker, and as to the means of securing listings, handling prospects, and consummating deals, and shall be free from control of first party as to the manner and method of conducting* second party's services as real estate broker, it being the intent that second party is an independent contractor, and not a servant, employee, joint adventurer, or partner of first party.

Let us now look at the evidence to see what the actual operations of appellant and these brokers were under the contract, for in the case of *McDermott v. State,* 196 Wash. 261, 82 P. (2d) 568, we held that certain barbers and other operatives there involved were in fact, under the evidence, in "employment" of McDermott, regardless of a so-called lease agreement.

Melville Wilson, one of the brokers associated with appellant, has lived in Seattle since 1905, and has been in the real estate business since 1911. He has a real estate broker's license for which he made application and for which he paid. He furnished the bond required, and paid the premium thereon. He testified:

"Q. Why did you not apply for a salesman's license? A. Because I am not a salesman, I am an individual broker, I work alone. Q. How long have you been associated as an independent broker with the firm of Henry Broderick, Inc.? A. I believe it was December, 1938. Q. '38. And as such a broker, who pays the expenses that you incur in your sales activities? A. With the exception of the office, I pay everything myself. Q. And what do you mean by 'office?' A. I have a desk and telephone. Q. Those are the office facilities that are referred to in the contract? A. Yes. Q. All other expenses that you are put to in conducting your business and in making your sales . . . A. They are mine. Q. In addition to the bond premium, and the license fee, who pays any taxes that you are obligated to the state? A. I do. Q. Now, do you have access to all listings in the office of Henry Broderick, Inc.? A. Yes. Q. Did you ever attend these sales meetings that were testified to by Mr. O'Brien? A. Whenever it is convenient, whenever I can do it. Q. Are you under any compulsion to do that? A. Oh, no. . . .

"Q. Do you recognize any control over you by Henry Broderick, Inc. or any one else? A. No. Q. Do you have any regular time or hours? A. I couldn't have any regular hours, I work whenever it is convenient. Q. Do you have a car of your own? A. Yes, sir. Q. And you pay for your oil and gas? A. Oh, yes. Q. And do you have an insurance policy? A. Yes. Q. And who is the insured? A. I am. Q. You heard the testimony of Mr. O'Brien with reference to the brokers or some of them desiring to specialize in certain areas? A. Yes. Q. Do you specialize in any area? A. Not in any area, I specialize in commercial property. . . .

"Q. And is that at your wish or at the dictation of Henry Broderick, Inc.? A. They have nothing to do with it, that is what I want to do. Q. Does that fact, however, militate against your making a sale of residential property if you wanted to? A. No, I can sell anything I want. Q. Are you required to make any specific calls during the day by Henry

Broderick, Inc.? A. Oh, no. Q. Are you under instructions from the firm as to your activities in any respect? A. No, I am an individual broker, I work alone. Q. Are you required to give your entire time to the business of selling real estate? A. No, I am in another business. Q. What other business? A. Food broker, canned foods. Q. And do you give such portion of your time as you see fit to that? A. Yes. Q. So as far as you know, may there not be other brokers similarly associated with Henry Broderick, Inc. that devote some of their time to other activities? A. There is one that devotes quite a bit of his time to other things. Q. Now, if you don't make a sale for a period of two months, do you receive any compensation of any kind in any form? A. Not on real estate business. . . .

"Q. Now, are the earnest money receipts necessarily signed in the office of Henry Broderick, Inc.? A. I don't remember having had one signed in the office. Q. Where are they often signed? A. In the owner's office or business office or home or place of business. Q. How about closing papers? A. They may be closed in a bank or title company's office or the lawyer's office or the office of Henry Broderick, Inc. Q. Now, in your practice as a broker and your relationship with Henry Broderick, Inc. tell us whether Henry Broderick, Inc. have assumed any obligations other than the desk and office facilities and telephone? A. No. Q. And have you assumed any obligations to Henry Broderick, Inc. other than to share the commission? A. That is all. Q. Who has the uncontrolled discretion as to the handling of leads and handling of prospects of property that you are trying to sell? A. Well, if I am going to do anything, I decide it myself, no one has anything to do about that. Q. And the mode of approaching the buyer, the prospective buyer? A. That is up to me."

Mr. Wilson prepares, or has prepared, advertisements when he desires, and appellant pays for the same. Mr. Wilson pays a business tax. Checks for earnest money are usually made out to appellant. The witness has sold property through John Davis Co. while associated with appellant, and the commission was divided between appellant and Mr. Wilson. The broker receives his share of the commission when a deal is closed.

Mr. Wilson further testified:

"Q. By my question, I mean the commissions don't pile up until the 15th and the 1st? A. No, it is my money, half of it is mine the minute the deal is turned."

Either party, upon notice given to the other, may terminate the association created by the contract.

The testimony continued:

"Q. You spoke in answer to Mr. Foley's question, of instances where another real estate firm has been associated with you and Henry Broderick, Inc., in the sale of a piece of real estate? A. Yes. Q. Is that relationship with that other real estate firm, for instance, John Davis and Company or West & Wheeler in any respect different than the association with Henry Broderick, Inc., as far as you know? A. No, they control the piece of property and I am a broker trying to sell it."

In so far as this record shows, the services of all the brokers are performed in the same way and under the same conditions as those of Mr. Wilson.

Let us now look to the testimony of Mr. Enge, treasurer of appellant, and see what some of the other practices are between appellant and these brokers:

"Q. If a broker becomes an employee, a salesman, is he permitted to continue with his broker license? A. The law prohibits him from so doing and the firm in actual practice does not allow it either, we won't hire as a salesman anyone with a broker's license. We have a man in our brokerage department, a man with a broker's license, who desired to become associated with us as an employee. He surrendered his broker's license and applied for a salesman's license. . . .

"Q. Now, turning again to the bookkeeping, is there any distinction in the manner in which commissions are handled and paid out where a commission emminates from the efforts of a broker as contrasted with a commission that is brought in as a result of an activity of a salesman? A. Yes, sir, there is a decided difference. Commissions with respect to a deal negotiated by a real estate broker comes out of an escrow or trust account on the books, out of which are paid other items than the commission such as title insurance, prorating of taxes, and various items that need to be paid out at the time of a closing of a real estate deal. In these accounts are also credited the earnest money payments and the balance of the purchase price, and out of these accounts

are paid the balance due to the seller. When the deal is consummated, there remains in this escrow or trust account, theoretically or usually the amount of the commissions, the total amount of the commission and that is paid in two halves to Henry Broderick, Inc. and to the brokers at the time the deal was closed. Q. Starting back at the beginning again, how are these accounts that you have termed as trust or escrow accounts headed or entitled? A. They bear the title of the seller and the purchaser, or the lesser and the lessee as the case may be. Q. And what usually constitutes the first entry in such an account? A. Earnest money deposits or deposit. Q. And as the money is paid on the purchase price, does that go into this escrow or trust account? A. Yes, sir. Q. When does any portion of that commission first enter the profit and loss account of Henry Broderick, Inc.? A. When the deal is closed and the commission is paid. Q. And is that simultaneously with the receipt of his share by the broker? A. Yes, sir. Q. And what is that broker's share usually? A. 50 per cent."

Practically all of the labor necessarily performed in consulting prospects, showing the property, etc., is performed in the field. No part of the commission due the broker ever goes into the profit and loss account of Henry Broderick.

The principal question presented on this appeal is whether or not these real estate brokers are in "employment" of appellant under the act. In considering this question, we have in mind our decisions holding that the administrative determination of the facts in such a proceeding as this is conclusive on the court, unless such determination is wholly without evidential support, or is wholly dependent upon a question of law, or is clearly arbitrary or capricious. *Unemployment Compensation Department v. Hunt,* 17 Wn. (2d) 228, 135 P. (2d) 89, and cases therein cited.

We also have in mind that in *State v. Goessman,* 13 Wn. (2d) 598, 126 P. (2d) 201, after referring to *Washington Recorder Pub. Co. v. Ernst,* 199 Wash. 176, 91 P. (2d) 718, 124 A. L. R. 667, we stated:

"The cases of *In re Farwest Taxi Service, Inc.,* 9 Wn. (2d) 134, 114 P. (2d) 164; *Mulhausen v. Bates,* 9 Wn. (2d) 264, 114 P. (2d) 995; *Virginia Mason Hospital Ass'n v. Larson,* 9 Wn. (2d) 284, 114 P. (2d) 976; and *In re Foy,* 10 Wn. (2d) 317, 116 P. (2d) 545, as stated in the recent case of *Sound*

*Cities Gas & Oil Co. v. Ryan, ante* p. 457, 125 P. (2d) 246, have committed

" '. . . this court to the view that our unemployment compensation act, which is similar to those of the majority of the states where this form of social security obtains, does not confine taxable employment to the relation of master and servant.'

"In the cases just cited, we adhered to the following rule announced in *McDermott v. State,* 196 Wash. 261, 82 P. (2d) 568:

" 'It is unnecessary to determine whether the common law relation of master and servant exists between respondent and the barbers and other operatives in his shop, because the parties are brought within the purview of the unemployment compensation act by a definition more inclusive than that of master and servant.' "

See, also, *Unemployment Compensation Department v. Hunt,* 17 Wn. (2d) 228, 236, 135 P. (2d) 89.

In view of the litigation which has followed the *McDermott* case, *supra,* and the contentions that have been made in each case as to the relationship of the parties involved, and particularly because of what is claimed we said in *Washington Recorder Pub. Co. v. Ernst, supra,* it would seem that there is still doubt in the minds of some members of the bar as to whether or not the rules applicable to the common-law relation of master and servant, should be applied in determining whether or not one is in "employment" of another under the unemployment compensation act.

In *Mulhausen v. Bates,* 9 Wn. (2d) 264, 275, 114 P. (2d) 995, we distinguished the *Recorder* case, *supra,* and apparently this distinction has been accepted in the cases subsequently decided, and as a result the decision in the *Recorder* case has not been considered as antagonistic to the rule announced in the *McDermott* case, *supra.*

The courts generally and this court have gone a long way in upholding the contentions of those whose duty it was to administer unemployment compensation acts, but there must be some limit to the meaning to be given the word "employment" under the act, and the relationship under which one can be considered in "employment" of another under the act.

Let us now look to the particular sections of our unem-

ployment compensation act with which we are here concerned. The original act will be found in Laws of 1937, chapter 162, p. 574.

Laws of 1937, chapter 162, § 19 (g) (1), as amended (now Rem. Supp. 1943, § 9998-119g (1)), provides:

" 'Employment,' subject to the other provisions in this sub-section, means service, including service in interstate commerce, performed for wages or under any contract of hire, written or oral, express or implied."

Laws of 1937, chapter 162, p. 611, § 19 (g) (5), as amended (now Rem. Supp. 1943, § 9998-119g (5)), provides:

"Services performed by an individual for remuneration shall be deemed to be employment subject to this act unless and until it is shown to the satisfaction of the Commissioner that:

"(i) Such individual has been and will continue to be free from control or direction over the performance of such service, both under his contract of service and in fact; and

"(ii) Such service is either outside the usual course of business for which such service is performed, or that such service is performed outside of all the places of business of the enterprises for which such service is performed; and

"(iii) Such individual is customarily engaged in an independently established trade, occupation, profession or business, of the same nature as that involved in the contract of service."

The above-mentioned parts of § 19 (g) of the original act of 1937 have not been changed, except that the word "director" has been changed to "commissioner."

Laws of 1937, chapter 162, p. 614, § 19 (m), provided:

" 'Wages' means remuneration payable by employers for employment. 'Remuneration' means all compensation payable for personal services, including commissions and bonuses and the cash value of all compensation payable in any medium other than cash, The reasonable cash value of compensation payable in any medium other than cash, and the reasonable amount of gratuities, shall be estimated and determined in accordance with rules prescribed by the director."

Laws of 1941, chapter 253, p. 915, § 14, provides:

"That section of chapter 214 of the Laws of 1939 which passed both houses of the Legislature as section 16, and

which appears in chapter 214 of the Laws of 1939 as an unnumbered section due to the number thereof having been included in a veto of a portion thereof by the Governor, which section is designated as section 9998-119 (a) of Remington's Revised Statutes (supp.), is hereby amended to read as follows:   .  .  .

"Section 19 (m) 'Wages' means the first three thousand dollars of remuneration payable by one employer to an individual worker for employment during one calendar year.  .  .  ."

Then, as a part of the same subsection, there is a definition of remuneration which is the same as that contained in the original § 19 (m), Laws of 1937, chapter 162.

The present section containing the definition of "wages" and "remuneration" will be found in Rem. Supp. 1943, § 9998-119m.   The question of whether or not a person or persons were in "employment" under the act has been before us in the following cases:   *McDermott v. State,* 196 Wash. 261, 82 P. (2d) 568; *Washington Recorder Pub. Co. v. Ernst,* 199 Wash. 176, 91 P. (2d) 718; *Mulhausen v. Bates,* 9 Wn. (2d) 264, 114 P. (2d) 995; *In re Farwest Taxi Service, Inc.,* 9 Wn. (2d) 134, 114 P. (2d) 164; *In re Foy,* 10 Wn. (2d) 317, 116 P. (2d) 545; *Sound Cities Gas & Oil Co. v. Ryan,* 13 Wn. (2d) 457, 125 P. (2d) 246; *State v. Goessman,* 13 Wn. (2d) 598, 126 P. (2d) 201; *In re Hillman Inv. Co.,* 15 Wn. (2d) 452, 131 P. (2d) 160; and *Unemployment Compensation Department v. Hunt,* 17 Wn. (2d) 228, 135 P. (2d) 89.

We are not going to attempt to discuss the basis of the decision in each of the above-mentioned cases other than to say that, with the exception of the *Recorder* case, *supra,* we recognized the relationship of employer and employee to exist, and that the wages or remuneration paid or to be paid by the employer to the employee, whether in the form of commissions or otherwise, was in fact paid or to be paid by the employer from money belonging to the employer.   In most of the cited cases, it was contended that the so-called employee was an independent contractor and not an employee.   Thus in *Mulhausen v. Bates, supra,* while the representative Farmer received a commission for his services, which commission he deducted from the purchase price of

the oleomargarine before remitting to Mulhausen at Portland, we held that, under the method Mulhausen employed in doing business, he was in fact the vendor to the ultimate consumer (the purchaser). This being true, the money paid or retained by Farmer as commission was *Mulhausen's money,* and such commission constituted wages paid by Mulhausen to Farmer for personal services rendered.

None of the cited cases presents a factual situation similar to the facts in the instant case.

■ It may be that we have not been as definite as we might have been in setting out the steps to be followed in determining whether or not one was in "employment" under the act. In order to clear up any possible misunderstanding that may now exist, we now state, after a consideration of the statute, our own cases, and other authority, that in making the initial determination of whether or not one is in employment under the act, the first question to be determined is whether, under the facts, such one performed personal services for another for wages, or remuneration, or under a contract of hire. Such a contract of hire contemplates a relationship whereby the employee furnishes personal services to his employer for wages or remuneration to be paid by such employer. If this question be answered in the affirmative, then under the act such one is in employment. If this question be answered in the negative, such one is not in employment under the act. If the question be answered in the negative, then Rem. Supp. 1943, § 9998-119g (5), has no application and is not to be considered. If the question is answered in the affirmative, then such person is in employment under the act unless excluded from its operation by reason of having met the tests prescribed by § 9998-119g (5).

We stated in *In re Hillman Inv. Co.,* 15 Wn. (2d) 452, 131 P. (2d) 160:

"Since the claimants performed services for remuneration, they were employees of appellant within the meaning of the act, *unless it appears that they were exempt under the exceptions contained in Rem. Rev. Stat. (Sup.), § 9998-119 [P. C. § 6233-317] (g) (5),* which provides:" (Italics ours.)

This case was decided November 24, 1942. It distinguishes the *Recorder* case, *supra,* and refers to *Sound Cities Gas & Oil Co. v. Ryan, supra,* and *Mulhausen v. Bates, supra.*

As applied to the instant case, the first question to be considered would be whether or not, under the facts, these brokers performed personal services for appellant for wages, or remuneration, or under a contract of hire. If the question be answered in the affirmative, then under Rem. Supp. 1943, § 9998-119g (1), such brokers would be in "employment" under the act unless excluded by reason of having met the tests prescribed by Rem. Supp. 1943, § 9998-119g (5). If the question be answered in the negative, then these brokers would not be in employment under the act, and Rem. Supp. 1943, § 9998-119g (5) would have no application and would not be considered, for subsection (5) is an exception provision, applying and applicable only after it has been determined that one is in employment under the act.

The above interpretation has been placed upon a statute almost identical with our Rem. Supp. 1943, § 9998-119g, by the supreme court of Utah in *Singer Sewing Mach. Co. v. Industrial Commission, etc.,* 104 Utah 175, 134 P. (2d) 479, after a consideration of all of the cases theretofore decided by the court touching the question here involved. See, also, *Singer Sewing Mach. Co. v. Industrial Commission,* 104 Utah 196, 141 P. (2d) 694, which was a rehearing of the original case in 104 Utah 175. We are of the opinion such an interpretation is sound, and we are further of the opinion it is not in fact contrary to our decisions.

We have read and considered the case of *Creameries of America v. Industrial Commission,* 98 Utah 571, 102 P. (2d) 300, quoted from at length in the brief of respondent, which case was considered in the *Singer Sewing Mach. Co.* case, *supra.* We find nothing in the *Creameries of America* case in regard to the meaning of the terms "service" and "employment" substantially different from the meaning given to those words by our own decisions, and nothing which convinces us that the conclusion reached upon the facts presented in this case and the law applicable thereto is con-

trary to the meaning of the term "employment" as used in our statutes.

Respondent has also cited cases from other jurisdictions, among them *Rahoutis v. Unemployment Compensation Commission,* 171 Ore. 93, 136 P. (2d) 426; *Singer Sewing Mach. Co. v. State Unemployment Compensation Commission,* 167 Ore. 142, 103 P. (2d) 708, 116 P. (2d) 744, 138 A. L. R. 1398. The cited cases are in our opinion factually different from the instant case and not controlling herein.

■ Counsel for respondent contended in his oral argument that, when one has performed services which *benefit* another, then the person performing such service is in employment under the act, unless the employer has met the three tests contained in Rem. Supp. 1943, § 9998-119g (5). With this contention we cannot agree. It is undoubtedly true that, in the instant case, appellant received some benefit from the services performed by these brokers, but the receipt of benefits is not alone the test of whether or not one is in the employment of another under the act. Before it could be determined that these brokers were in "employment" of appellant under the act, it must appear from the evidence, or be reasonably inferable therefrom, that the brokers rendered personal services to appellant for wages, or remuneration, or under a contract of hire.

■ In the instant case, an association was formed between appellant and these brokers for the mutual benefit of both. What term the parties may have applied to the relationship is not binding upon us. Appellant contributed to such enterprise certain office facilities, and the brokers contributed their services. Each party, for his contribution to the enterprise, was to receive half of the commission coming in from the sale of real estate as the result of their joint efforts. The half of the commission to which the broker was entitled upon completion of the deal, never was intended to and never did become the property of the appellant. It was the property of the broker from the time it was earned, and was so considered by both parties. Appellant never agreed to pay and never did pay the brokers any wages or remuneration as those terms are defined in the statute, and

was not in fact an employer of these brokers under the act, nor was the contract here involved a contract of hire.

We are clearly of the opinion that the evidence in this case wholly fails to show that these brokers were in the "employment" of appellant.

In conclusion, may we call attention to the real estate broker's act of 1941, and particularly to Rem. Supp. 1941, § 8340-25 (1):

"A 'real estate broker' is a person whose business policies and acts are free from the direction, control or management of another person, who for a compensation or promise thereof, or with intent to collect or receive a compensation or promise thereof, performs one or more acts of selling or offering for sale, buying or offering to buy, negotiating or offering to negotiate, either directly or indirectly, the auction, purchase, sale, exchange, lease or rental of real estate or interest therein for another person, or who shall advertise or hold himself out to the public by any oral or printed solicitation or representation that he is so engaged, or who takes any part in or directs or assists in the procuring of prospects or in the negotiation or closing of any transaction, which does, or is calculated to result in any of the acts above set forth, and hereinafter referred to as a broker."

It is evident from the above definition that the legislature considered a real estate broker as free from control of another in his operations.

We also desire to call attention to the fact that Rem. Supp. 1943, § 9998-119g (xiv) (Laws of 1943, chapter 65, p. 119), provides:

"The word 'employment' as used herein shall not include services performed by a real estate broker, real estate salesman, or real estate agent to the extent that he is compensated by commission."

We do not base this opinion in any degree upon either of the statutes last above set out. However, it might be argued that they do indicate to some extent that the legislature never intended that a real estate broker in this state who performed services for a commission under circumstances such as appear in this case, was intended to be considered as in "employment" under the statute.

For the reasons herein assigned, we are of the opinion the trial court erred in holding that these brokers performed personal services for appellant for wages or remuneration, or under contract of hire; in holding that they were in "employment" of appellant; and in holding that appellant was liable for the contributions sought to be collected herein.

The judgment of the trial court is reversed, with instructions to enter judgment dismissing this proceeding.

BEALS, C. J., STEINERT, ROBINSON, and SIMPSON, JJ., concur.

MILLARD, J. (concurring)—I concur in the result for the reasons given in dissenting opinion in *Mulhausen v. Riley*, post p. 811, 157 P. (2d) 938, and in *Washington Recorder Pub. Co. v. Ernst*, 199 Wash. 176, 91 P. (2d) 718.

It is stated in one of the opinions in *Mulhausen v. Riley*, supra, which is in irreconcilable conflict with the case at bar, and *Curtis v. Riley*, post p. 951, 157 P. (2d) 975, that the doctrine of *Washington Recorder Pub. Co. v. Ernst*, supra, limiting the relationship of employer and employee, as defined in the unemployment compensation act, within the bounds of common-law concepts relating to master and servant, had been overruled.

The position of respondent commissioner on the facts and in principle logically must be accepted or rejected in all three of the following cases: The case at bar, *Curtis v. Riley*, supra, and *In re Coppage*, post p. 802, 157 P. (2d) 977. Those three cases, in principle, are indistinguishable from *Washington Recorder Pub. Co. v. Ernst*, supra. Any attempted distinction is *quibbling* and accentuates the confusion now in the minds of bench and bar as to what we may hold when another unemployment compensation case is brought to this court.

September 12, 1943, Honorable Pat McCarran, Senior United States Senator from Nevada, delivered at the commencement exercises of Georgetown University, Washington, D. C., an address entitled "Our American Constitutional Commonwealth—Is It Passing?"

I quote the following apt challenging statements made by Senator McCarran in his able and informative address which was printed in the Congressional Record of September 15, 1943:

"My friends of the graduating class, you today go out into a world of trouble; each of you in civilian clothes for the last time, perhaps, for some months. Regardless of the particular school from which you graduate, and no matter where your footsteps may lead you in the months to come, it behooves us to remind you of the fact that you are Americans, and, being Americans, remember that your brothers are in arms today on many battle fronts of the world. You, too, will take up the battle; you, too, will carry on the obligations; but, with God's will, you will return to a Nation that looks to you in the post-war period for its sustenance, its continuation, and its future guidance. So today, that you may take with you at your graduating hour some of the things that are in the minds of those who carry the responsibility in government, I have attempted to formulate some thoughts that might impress upon you the fineness and the splendor of the government that gave you freedom of life. Then I would bring to your attention a few of the dangers that appear to be imminent, threatening the very existence of that Government. Those of us who take the responsibility of government seriously realize and see those dangers, and, seeing them, would militate against them, so that on your return from military fields you may have and enjoy the freedoms that have abided in this great country for a century and a half.

"Public administration is never so difficult, and good public administration is never so important, as in time of war. In wartime it becomes the appropriate function of Congress to vote vast lump-sum appropriations, and to make the broad delegations of power which the Executive needs. But the fact that we are engaged in a war does not mean that we must revise our form of government. We are making war as an organized Nation, and one of the purposes for which we fight is the preservation of our constitutional liberties and our constitutional form of government. We must not let that essential truth escape us.

"The founders of this Republic, the framers of our Constitution, were passionately devoted to the principle of government by consent of the governed. Adherence to this principle presupposes an orderly procedure under which laws are enacted by the elected representatives of the

people, interpreted impartially by the courts in the light of our great basic law, and administered by public servants in accordance with such interpretation. Nothing could be more violative of the principle of government by consent of the governed than a system under which laws are made by appointive officials, interpreted by the same or other appointive officials, and administered by the same or still other appointive officials.

"It is no fallacy, and it is no quibble, to say that a large body of our law today is so made, so interpreted, and so administered. Not only by Executive order, but by a constant stream of 'directives' issued by various administrative agencies of the Government, rules and regulations are continually being put in force and given effect which have had no sanction by the Congress. Yet, without such sanction, and often without color of support from any constitutional source, these rules and regulations have all the force of law; more than that, they are law; and frequently they actually supersede laws passed by the Congress.

"Statutory provisions enacted by the Congress, in the exercise of powers clearly constitutional, have been expanded or contracted, added to or subtracted from, by the Executive branch of the Government, without hesitation. As an example of expanding a congressional act, we may cite the Anti-Inflation Act. An example of adding to statutory authority is the Executive order setting up the War Manpower Commission, section 5 of which provides that 'no employer shall retain in his employ any worker whose services are more urgently needed in any establishment, plant, facility, occupation, or area designated as more essential' by the Chairman of the War Manpower Commission. We have been unable to discover anything in the Selective Service Act, or in either of the War Powers Acts, or in any other Act of Congress with which we are familiar, which can be cited as the basis for that decree.

"This trend toward greater centralization of governmental power, with and through the growing tendency to legislate by directive, is either a sound and logical development within the framework of our American constitutional commonwealth, or it is a departure from that framework, a movement away from the basic principles of true democracy. If the latter, it is either justified by events and results, or it is unjustifiable. It will profit us to examine just what is the case.

"When the framers of our Constitution rested from their labors, they rested firm in the conviction that the document

which they had drawn would forever preserve and protect those rights which must remain in the States, and those rights which must remain in the people, in order to preserve that happy balance of government which would insure our national security and perpetuity.

"The system of checks and balances provided by the Constitution, with three branches of government, the legislative, the executive, and the judicial, was regarded by those constitutional founders, with what seemed to them unassailable logic, as a perfect protection against too great an accumulation of power under any one authority; for they considered it unthinkable that any one branch should ever be able to usurp the powers of another branch.

"But that was in 1787. In July 1935 a President of the United States wrote to the chairman of a House Subcommittee on Ways and Means urging passage of a certain bill and concluding with the statement: 'I hope your committee will not permit doubts as to its constitutionality, however reasonable, to block the suggested legislation.'

"Only a few decades ago the Congress reprimanded most severely a Cabinet member who had the unprecedented temerity to send to the Senate the text of a bill which he wished to see enacted. Today this procedure not only is common practice but is by no means confined to Cabinet members. If you list the major bills which have been enacted into law by the Congress in recent years, you will find that a substantial number of them originated, not in response to popular demand expressed through the duly elected representatives of the people, but in the brain of some one member of the executive branch of the Government, or some small group within that branch; and were drafted, not in the Halls of Congress but in some administrative office, or executive conference room, or in the cubbyhole of some second assistant supervisor of auxiliary functions. Such a bill, however brilliantly written, cannot be an expression of the will of the people, but only a mirror of the ideas and ideals of its author and of the mood of his executive and administrative superiors.

"In a few of their objectives, in some of their attitudes, and in many of their excesses, no small number of these wearers of the bureaucratic purple are reincarnated Romans in full accord with the traditions primarily responsible for the fall of the Roman Empire.

"When you give any man unlimited power, it is like giving a schoolboy a gun; he wants to go out and shoot it off.

"When a man rises to an important position it is custom-

ary to suppose that his advancement has been due, at least in part, to some special merit; but this is not always true even in private business and industry, and certainly it is not always true in government. Still, most people are likely to believe it. Usually, the one who believes it most strongly is the man himself. As a result of this rather common failing, most of the men who write our administrative law, and who interpret it and administer it, have come to regard themselves as rather superior beings. In some cases they are. In many cases they are not. This feeling of superiority is manifested in a great many ways, ranging all the way from the petty dilatory tactics with which sundry petty bureaucrats seek to bolster their own petty egos, to the complete disregard of ordinary civil rights and established democratic processes and procedures which every now and then is evidenced by some new executive promulgation or administrative interpretation.

"The Constitution contains many provisions intended as safeguards against too much centralization of authority in the executive (or administrative) branch of the Government.

"In article I, section 2 provides that 'all legislative powers herein granted shall be vested in a Congress of the United States.' Is there anything unclear about the meaning of that?

"Paragraph 2 of section 6 provides that 'no person holding any office under the United States shall be a Member of either House of Congress during his continuance of office.' Why this provision, except to avoid any overlapping of executive or administrative functions, on the one hand, and legislative functions, on the other?

"Paragraph 18 of section 7 specifically delegates to Congress the power 'to make all laws which shall be necessary and proper for carrying into execution . . . all . . . powers vested by this Constitution in the Government of the United States or in any department or office thereof.' This is an expansion and reiteration of the second section, but it is also important because it covers specifically the situation which the average 'directive' purports to meet, that is, a need for additional 'law'—rule or regulation—necessary and proper for implementing some power or powers already granted to some department or office of the Government. We see that the Constitution says Congress shall make such laws. Do we hear the voices of a chorus of administrative lawmakers saying: 'Congress is too slow, so we'll do it;

Congress can't be trusted, so we'll do it'? Or is that only their actions speaking for them?

"We are minded on occasion to call to the attention of one or another Government administrator the fact that Members of the Congress are not alone in taking oath to support the Constitution. Paragraph 3 of article 6 requires that not only Senators and Representatives, but the members of all State legislatures, 'and all executive and judicial officers both of the United States and of the several States, shall be bound by oath or affirmation to support this Constitution.' Compliance with that paragraph is just about 100 per cent. That is, everybody takes the oath.

"It is not only in the body of the Constitution that we find provisions bearing on this question.

"The Bill of Rights sets up further safeguards. Sometimes we fear there is a tendency to overlook some of the provisions in these first 10 amendments to our Constitution. We wonder, for instance, if all the rules and regulations of the O. P. A., and their enforcement, are in strict conformity with the fourth amendment which provides that: 'The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.'

"We wonder, whether the provision of the fifth amendment that: 'No person shall be deprived of life, liberty, or property, without due process of law,' ever contemplated, in the intention of its framers, a process of administrative law under which a 'hearing commissioner' of some executive branch of the Government will sit as judge and jury over a citizen charged with violation of some order promulgated by an executive officer of the Government without any specific authority from the Congress of the United States.

"We wonder how such a procedure, under administrative law, comports with the provision of the sixth amendment that: 'In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury.'

"The last two items in the Bill of Rights are of tremendous importance. They are sentinels against overcentralization of government, monuments to the wisdom of the constitutional framers who realized that for the stable preservation of our form of government, it is essential that local governmental functions be locally performed.

"The ninth amendment to the Constitution provides that 'The enumeration in the Constitution, of certain rights, shall not be construed to deny or disparage others retained by the people.'

"The tenth amendment to the Constitution provides that: 'The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people.'

"Many signs today seem to indicate that the wisdom of the philosophy which guided the framing of these amendments is being forgotten. We have heard it said that the belief is spreading in this country 'That the people are not capable of governing themselves; that the problems of today are so complex that the citizen at large must of necessity be detached from his own difficulties.' If such a belief ever becomes the prevailing political philosophy of these United States, we cannot predict what type of government we shall then get. Perhaps a benevolent dictatorship, perhaps a dictatorship not so benevolent; perhaps national socialism; perhaps even a monarchy; but certainly not a democracy.

"Fully centralized control of all governmental functions, in a bureaucracy founded upon administrative law, is the very antithesis of that democracy in which all our rights are rooted; the democracy from which spring all our hopes, not only for a better future, but even for a maintenance of the unnumbered freedoms which we as a Nation have enjoyed since the foundation of our Republic.

"The Governor of a great American State, who afterward became President of the United States, once said: 'To bring about government by oligarchy, masquerading as democracy, it is fundamentally essential that practically all authority and control be centralized in our national Government. The individual sovereignty of our States must first be destroyed. We are safe from the danger of any such departure from the principles by which this country was founded just so long as the individual home rule of the States is scrupulously preserved and fought for whenever it seems in danger.' That statement is as true now as when it was made, 13 years ago.

"Dictatorship is not always a creature of war; sometimes it comes tiptoeing stealthily upon an unsuspecting people in time of peace; and sometimes it is builded secretly by the people themselves, unknowing the potentialities of what they create; until like Frankenstein's monster, similarly builded, it is unleashed to accomplish the enslavement or destruction of its creator.

"It has been said that true statesmanship must know a higher purpose than vote getting. We cannot argue with that thesis. But we say to you that if every Member of both Houses of Congress guided his every action by the criterion of whether what he did would win him votes or lose him votes at the next election, the body of law enacted by such a Congress would be vastly preferable to a body of law created by men owing no allegience to any group of voters, and giving no particular thought or weight to public opinion, either in the country as a whole or within any particular section of it.

"With every upsurge in the power of the administrative lawmaker and his alter ego, the bureaucrat, there is a concomitant slackening of initiative, a mushrooming of inertia, in the handling of State and local problems. This is more than a temporary tilting of the scales; it is a derangement of the fundamental balance which has maintained our form of government for over 150 years as the outstanding example of a free democracy. It may be a tipping of the chute down which, if it be not righted, we may eventually plummet toward the abyss of fascism. May God forbid!

"Government by administrative law breeds opportunity for personal arrogance; evades the courts; sneers at the rules of stare decisis; affords no precedents; and fortifies itself by pointing ridicule at Congress and other lawmaking bodies of our Nation.

"Administrative law has its seat of justice in the fiber and temperament of the individual administrator who may, if he chooses, recognize individual human rights and freedoms; or who may ignore or abrogate such rights with relative impunity, protecting himself with the law he has made and the law which is his to make.

"The growth of legislation by administrative directive is the step between democracy, with constitutional guaranties protecting the body of the law in the people, and a government by men with their backs to the wall, hurling defiance at constitutional and substantial changes prompted by progress and founded on the spirit of the law.

"Is this the bridge upon which we as a Nation now stand? If so, which way are we facing? The one end rests on the glory of the spirit of the law; the other on the popularity or prudence of the administrator. On one hand is democracy; on the other is autocracy, the bondmaid of dictatorship.

"I could not close my expressions to you, my young friends, without bringing back to you the words of that great priest, prince, and philosopher, James Cardinal Gib-

bons, when he said: "The law is not the people; the people is not the law. The law is the spirit of justice governing the people, and its application to individuals, to associations, to every form of civil life, must be so hedged around with reverence and security that the civil courts may, in an hour of popular passion, protect all the people from the tyranny of what might be a lawless majority.'"

MALLERY, J. (dissenting)—I dissent for two reasons: First, because the majority opinion reinstates the rule of the case of *Washington Recorder Pub. Co. v. Ernst, supra,* by a process unknown to the law, viz., by interpreting it to mean something entirely different from what it says and second, because it judicially repeals Rem. Rev. Stat. (Sup.), § 9998-119 [P. C. § 6233-317] (5) by reading it out of the unemployment compensation act.

All of the cases that have come before this court seeking an interpretation of the term "employment" as defined in the unemployment compensation act have presented one basic issue: Shall the statutory definition or the common-law concepts of master and servant prevail? There is no confusion as to the issue. It is crystal clear. Unfortunately, as much cannot be said for our decisions. I agree with the statement of the writer of the *Washington Recorder Pub. Co. v. Ernst, supra,* in his opinion concurring with the majority opinion in the case at bar, that:

". . . in *Mulhausen v. Riley, supra,* which is in irreconcilable conflict with the case at bar, and *Curtis v. Riley, post* p. 951, that the doctrine of *Washington Recorder Pub. Co. v. Ernst, supra,* limiting the relationship of employer and employee, as defined in the unemployment compensation act, within the bounds of common-law concepts relating to master and servant, had been overruled.

"The position of respondent commissioner on the facts and in principle logically must be accepted or rejected in all three of the following cases: The case at bar, *Curtis v. Riley, supra,* and *In re Coppage, post* p. 802. Those three cases, in principle, are indistinguishable from *Washington Recorder Pub. Co. v. Ernst, supra.* Any attempted distinction is *quibbling* and accentuates *the confusion now in the minds of bench and bar* as to what we may hold when another unemployment compensation case is brought to this court." (Italics mine.)

The supreme court of the state of Oregon also agreed in this language in the case of *Singer Sewing Mach. Co. v. State Unemployment Compensation Commission,* 167 Ore. 142, 174, 103 P. (2d) 708, 116 P. (2d) 744: "The two Washington cases cited in the opinion disclose an unsettled state of the law there."

Whence comes this confusion? That it centers around *Washington Recorder Pub. Co. v. Ernst, supra,* is clear if the decisions on the question of what "employment" means are followed in the order in which they were handed down. Starting with *McDermott v. State,* 196 Wash. 267, 82 P. (2d) 568, in which the respondents, in seeking exclusion from the act, contended that the relationship involved was that of landlord and tenant and not master and servant, the court said:

"*It is unnecessary to determine whether the common law relation of master and servant exists* between respondent and the barbers and other operatives in his shop, because the parties are brought within the purview of the unemployment compensation act by a definition more inclusive than that of master and servant." (Italics mine.)

This made it clear that the statutory definition was given effect and that the common-law concepts of master and servant were disregarded.

Thus stood the law when *Washington Recorder Pub. Co. v. Ernst, supra,* came before this court. In that case it was contended that the newsboys were independent contractors. The trial court so held, and this court affirmed it. The court said:

"The extension of the term 'employment' to include independent contractors and others not within the employer-employee relationship, which is one of the positions taken by the attorney general, invites a challenge to the constitutionality of the act, as the tax exacted of the employer would be a tax upon the naked right to contract."

The gist of the case is found in the following quotation from it:

"In drafting the statute, the legislators attempted to codify the common law. They intended that the common law

test of employment relationship should likewise be the test under the unemployment compensation act.".

Thus, for the first time, the common-law concepts of master and servant were made the test of the applicability of the act rather than the statutory definition of employment. That is to say, the statutory definition was held not to mean what it said but that it meant all that is said in the books on the law of master and servant. This holding being irreconcilable with the *McDermott* case, it was logically impossible to arrive at it without overruling it. This was not done specifically, and confusion was made inevitable unless the court was to hold thenceforth that the *McDermott* case had been overruled *sub silentio*.

In every subsequent case, the employers relied upon the *Recorder* case to sustain their contentions that the relationships involved were not those of master and servant under the common law, but were instead landlord and tenant, joint adventure, independent contractor, principal and agent, or vendor and vendee; and that, therefore, the statutory definition did not include them because it had been held to include only the master and servant relationship under the common law.

In the next case to come before the court, *In re Farwest Taxi Service, Inc.,* 9 Wn. (2d) 134, 114 P. (2d) 164, the conflicting principles of the *Recorder* case and the *McDermott* case were not discussed other than to say:

"Whatever relationships are excluded from the scope of the term 'employment,' as defined by the act, it seems clear that the act covers such contractual relationships as would be held to constitute employer and employee, or master and servant, at common law. *McDermott v. State,* 196 Wash. 261, 82 P. (2d) 568; *Washington Recorder Pub. Co. v. Ernst,* 199 Wash. 176, 91 P. (2d) 718, 124 A. L. R. 667."

This did not hold that the *McDermott* case had been overruled *sub silentio,* but it has been asserted by some individuals to hold that both of these irreconcilable cases were in effect. This marks the beginning of the confusion.

This case was followed by *Mulhausen v. Bates,* 9 Wn. (2d) 264, 114 P. (2d) 995, in which effect was given to the stat-

utory definition rather than the common law. The *Recorder* case was distinguished on the ground that, in that case, the relationship of vendor and vendee in fact existed.

Next came the case of *In re Foy*, 10 Wn. (2d) 317, 116 P. (2d) 545, in which the court said:

"Several recent decisions from other jurisdictions have been cited and thoroughly reviewed in the briefs of counsel for the respective parties to this proceeding and in the briefs filed by *amici curiae*. While recognizing the divergent views of different courts upon this question, we are convinced that our statute was correctly construed in the *Mulhausen* case.

"*It must be held, then, that claimants are within the* purview of the act, unless from the record it should be held that the existence of all three of the elements defined in subdivisions (i), (ii), and (iii), have been established." (Italics mine.)

This overruled the *Recorder* case *sub silentio* by adhering to the statute rather than the common law.

The next case was *Sound Cities Gas & Oil Co. v. Ryan*, 13 Wn. (2d) 457, 125 P. (2d) 246. The court again overruled the *Recorder* case *sub silentio* and went back to the *McDermott* case in these words:

"The opinions of this court, just cited, with the exception of *Washington Recorder Pub. Co. v. Ernst, supra*, commit this court to the view that our unemployment compensation act, which is similar to those of the majority of the states where this form of social security obtains, does not confine taxable employment to the relation of master and servant. *If the common-law relationship of master and servant was to obtain, the legislature would have so stated.* That the legislatures, in passing unemployment compensation acts, intended to draw away from the old definition is illustrated by the following statement contained in *Unemployment Comp. Commission v. Jefferson Standard Life Ins. Co.*, 215 N. C. 479, 2 S. E. (2d) 584:" (Italics mine.)

This court said in *State v. Goessman*, 13 Wn. (2d) 598, 126 P. (2d) 201, the next case to come before the court:

"The cases of *In re Farwest Taxi Service, Inc.*, 9 Wn. (2d) 134, 114 P. (2d) 164; *Mulhausen v. Bates*, 9 Wn. (2d) 264, 114 P. (2d) 995; *Virginia Mason Hospital Ass'n v. Larson*, 9 Wn. (2d) 284, 114 P. (2d) 976; and *In re Foy*, 10

Wn. (2d) 317, 116 P. (2d) 545, as stated in the recent case of *Sound Cities Gas & Oil Co. v. Ryan, ante* p. 457, 125 P. (2d) 246, have committed

" ' . . . this court to the view that our unemployment compensation act, which is similar to those of the majority of the states where this form of social security obtains, *does not confine* taxable employment to the relation of master and servant.'

"In the cases just cited, we adhered to the following rule announced in *McDermott v. State,* 196 Wash. 261, 82 P. (2d) 568:

" 'It is unnecessary to determine whether the common law relation of master and servant exists between respondent and the barbers and other operatives in his shop, because the parties are brought within the purview of the unemployment compensation act by a definition more inclusive than that of master and servant.' " (Italics mine.)

The *McDermott* case was reaffirmed and again the *Recorder* case was overruled *sub silentio.* These last two cases were too clear to admit of any doubt as to the status of the *Recorder* case. The confusion was cleared away.

Notwithstanding these decisions subsequent to the *Recorder* case, in the next case to come before this court, *In re Hillman Inv. Co.,* 15 Wn. (2d) 452, 131 P. (2d) 160, this court recognized the *Recorder* case as not being overruled *sub silentio* by distinguishing it. The confusion was back again.

The last case, involving the present question, that came before this court previous to the present term of court, was *Unemployment Compensation Department v. Hunt,* 17 Wn. (2d) 228, 135 P. (2d) 89. In that case, the court said:

"From the time of the adoption of the original unemployment compensation act in 1937 and the subsequent amendments thereto, we have repeatedly held that the administrative determination of the facts involved in a proceeding instituted pursuant to the act is conclusive on the courts, unless such determination is wholly without evidential support, or is wholly dependent upon a question of law, or is clearly arbitrary or capricious. *In re St. Paul & Tacoma Lbr. Co.,* 7 Wn. (2d) 580, 110 P. (2d) 877; *In re Farwest Taxi Service, Inc.,* 9 Wn. (2d) 134, 114 P. (2d)

164; *Mulhausen v. Bates*, 9 Wn. (2d) 264, 114 P. (2d) 995; *Virginia Mason Hospital Ass'n v. Larson*, 9 Wn. (2d) 284, 114 P. (2d) 976; *In re Foy*, 10 Wn. (2d) 317, 116 P. (2d) 545; *In re North River Logging Co.*, 15 Wn. (2d) 204, 130 P. (2d) 64; *In re Hillman Inv. Co.*, 15 Wn. (2d) 452, 131 P. (2d) 160; *Knestis v. Unemployment Compensation & Placement Division*, 16 Wn. (2d) 577, 134 P. (2d) 76. . . .

"We have upon a number of occasions held that our unemployment compensation act does not confine taxable employment to the relationship of master and servant, but brings within its purview many individuals who would otherwise have been excluded under common-law concepts of master and servant, or principal and agent. *McDermott v. State*, 196 Wash. 261, 82 P. (2d) 568; *Mulhausen v. Bates*, *supra; In re Foy*, *supra; Sound Cities Gas & Oil Co. v. Ryan*, 13 Wn. (2d) 457, 125 P. (2d) 246; *In re Hillman Inv. Co.*, *supra*.

"Construing § 19(g) (5), above quoted, we have also repeatedly held that services performed by an individual for remuneration must be deemed 'employment' under the act *unless the person challenging the relationship of employer and employee* establishes all three of the exceptions enumerated in the foregoing section of the statute, for the reason that these exceptions, sometimes referred to as 'tests,' are stated conjunctively, not disjunctively. *Mulhausen v. Bates*, *supra; In re Foy*, *supra; Sound Cities Gas & Oil Co. v. Ryan*, *supra; In re Hillman Inv. Co.*, *supra*." (Italics mine.)

This language was too clear to leave any doubt or confusion as to the status of the *Recorder* case. It was again overruled *sub silentio*. The writer of the *Recorder* decision concurred in it.

Thus the law, as it stood at the beginning of the present term of this court, as gathered from the foregoing cases, was: "The administrative determination of the *facts* involved in a proceeding instituted pursuant to the act *is conclusive on the courts,* unless such determination is wholly without evidential support, or is wholly dependent upon a question of law, or is clearly arbitrary or capricious." "It is unnecessary to determine whether the common-law relation of master and servant exists." "If the common-law relationship of master and servant was to

obtain, the legislature would have so stated." "The act does not confine taxable employment to the relation of master and servant." " . . . because the parties are brought within the purview of the unemployment act by a definition more inclusive than that of master and servant."

In other words, the factual determination of the commissioner, without regard to common-law concepts, was conclusive upon the courts unless the person challenging the determination established all three of the conjunctively stated "tests" of the statute. Indeed, any other construction, such as the one announced in the *Recorder* case, would leave the words "to the satisfaction of the commissioner" without any meaning whatever, and would give the administrative finding no standing in court as a *prima facie* case nor place any burden on the complaining party. The language of the act is too clear to bear such a construction. Rem. Rev. Stat. (Sup.), § 9998-119a (g) (5) [P. C. § 6233-317] reads as follows:

"Services performed by an individual for remuneration shall be deemed to be employment subject to this act *unless and until it is shown to the satisfaction of the commissioner that:*

"(i) Such individual has been and will continue to be free from control or direction over the performance of such service, both under his contract of service and in fact; and

"(ii) Such service is either outside the usual course of the business for which such service is performed, or that such service is performed outside of all the places of business of the enterprises for which such service is performed; and

"(iii) Such individual is customarily engaged in an independently established trade, occupation, profession or business, of the same nature as that involved in the contract of service." (Italics mine.)

Thus all of our cases, except the *Recorder* case, hold that the statutory definition embraces a field more inclusive than common-law master and servant; indeed, they state that for this reason it is not necessary to inquire as to the common-law nature of the service. They simply followed and applied the statutory definition of service or em-

ployment to determine whether or not there was an employment under the act. That is to say, every service, without reference to common law, was deemed to be employment subject to the act unless it met the test of the three conjunctively stated exclusion clauses.

In contrast with the holding of the foregoing cases, the rule of the *Recorder* case held that Rem. Rev. Stat. (Sup.), § 9998-119a (g) (5) in effect codified and restated the common-law tests for determining the existence of the relationship of independent contractor, leaving only the common-law relationship of master and servant as within the purview of the act and excluding therefrom all other common-law relationships of employment.

This conflicts with our other cases because it limits the application of the act to a restricted and smaller field of service than defined by the statute. It excludes from the purview of the act all common-law relationships of employment such as principal and agent, independent contractor, etc., except only that of master and servant. The wide difference in the fields covered demonstrates the impossibility of harmonizing the two rules. The *Recorder* case never has been followed by this court. It is in conflict with our other cases and has been repeatedly overruled *sub silentio*.

Notwithstanding, in the instant case the majority opinion says:

"In view of the litigation which has followed the *Mc-Dermott* case, *supra,* and the contentions that have been made in each case as to the relationship of the parties involved, and particularly because of what is claimed we said in *Washington Recorder Pub. Co. v. Ernst, supra,* it would seem that there is still doubt in the minds of some members of the bar as to whether or not the rules applicable to the common-law relation of master and servant, should be applied in determining whether or not one is in 'employment' of another under the unemployment compensation act.

"In *Mulhausen v. Bates,* 9 Wn. (2d) 264, 275, 114 P. (2d) 995, we distinguished the *Recorder* case, *supra,* and apparently this distinction has been accepted in the cases subsequently decided, and as a result the decision in the

*Recorder* case has not been considered as antagonistic to the rule announced in the *McDermott* case, *supra.*"

The writer of the majority opinion said in his concurring opinion to *Mulhausen v. Riley, post* p. 811:

"I am further of the opinion that it is not necessary to overrule the case of *Washington Recorder Pub. Co. v. Ernst,* 199 Wash. 176, 91 P. (2d) 718, in order to arrive at the conclusion reached in the majority opinion. *We accepted the interpretation placed upon the Recorder case in Mulhausen v. Bates,* 9 Wn. (2d) 264, 114 P. (2d) 995, in practically every case decided subsequent to the last cited case, and, if *such interpretation be now accepted,* the *Recorder* case, *supra,* in my opinion, does not conflict with the result reached herein."   (Italics mine.)

Heretofore we have been familiar with the process of interpreting a statute, overruling a case, and distinguishing a case. To these must now be added the process of interpreting a case. Persons citing the *Recorder* case in the future will remember that, whereas it said the newsboys were independent contractors, we have now held that the opinion intended to say, and will be taken as having said, that the newsboys were vendees until such a time as this interpretation is further interpreted.

By what process an opinion is interpreted is unknown to me, but in any event it is ingenious enough to harmonize the statements from the *Sound Cities* case that—"If the common-law relationship of master and servant was to obtain, the legislature would have so stated"—and the statement from the *Hunt* case, *supra,* that:

"We have upon a number of occasions held that our unemployment compensation act does not confine taxable employment to the relationship of master and servant, but brings within its purview many individuals who would otherwise have been excluded under common-law concepts of master and servant, or principal and agent. *McDermott v. State,* 196 Wash. 261, 82 P. (2d) 568; *Mulhausen v. Bates, supra; In re Foy, supra; Sound Cities Gas & Oil Co. v. Ryan,* 13 Wn. (2d) 457, 125 P. (2d) 246; *In re Hillman Inv. Co., supra.*

"Construing § 19(g) (5), above quoted, we have also repeatedly held that services performed by an individual

for remuneration must be deemed 'employment' under the act unless the person challenging the relationship of employer and employee establishes all three of the exceptions enumerated in the foregoing section of the statute, for the reason that these exceptions, sometimes referred to as 'tests,' are stated conjunctively, not disjunctively. *Mulhausen v. Bates, supra; In re Foy, supra; Sound Cities Gas & Oil Co. v. Ryan, supra; In re Hillman Inv. Co., supra.*"

with the rule from the *Recorder* case, that:

"In drafting the statute, the legislators attempted to codify the common law. They intended that the common law test of employment relationship should likewise be the test under the unemployment compensation act."

I am not prepared to assent to this process of interpretation, whatever it may be; I therefore dissent.

Second: The appellant corporation derives its income from the services of the agents here involved, who are not stockholders and therefore receive none of the profits of the business. Hence, by no stretch of the imagination can they be said to be donating their services to the corporation in order to participate in its earnings, or that their activities in furthering the company's business are not services. Under the act, we need not inquire what the common-law label for the service relationship may be. We have held this repeatedly. I agree with Judge Grady's analysis of what their common-law relationship is, but that is not the test and it is immaterial what it is. The test is that the appellant must meet the conjunctively stated exclusion clauses, once it has been administratively determined to be under the act, in order for us to exclude it therefrom. It does not meet a single one of the tests, and no one claims that it has done so. Appellant claims, before this court, that it is in a joint adventure. That can avail it nothing. The first test of the statute, "control," would then be presumed to exist as a matter of law. There can be no joint adventure without the element of "control." See *Poutre v. Saunders,* 19 Wn. (2d) 561, 143 P. (2d) 554.

However, the majority opinion does not depend on a finding that there is a joint adventure. It is based upon

the proposition that there was no employment. Since under the statute "services performed . . . for remuneration shall be deemed to be employment . . . ," it must necessarily take the next step and also hold that there were no services. The appellant corporation was, of course, quite remarkable in being able to conduct a real estate business without rendering any services through any mortal agency. If the commissioner was wrong in finding to the contrary, the statute requires the appellant to meet the test of the definition of employment in order to establish his error and thus be excluded from the act. Every case has so held, including the *Recorder* case. (It purported to apply the tests, but only on the basis that they were a codification of the common-law principles of master and servant and hence did not mean what they said.)

Now, for the first time, and without overruling the other cases, the majority opinion judicially repeals the statutory tests contained in the definition of employment under the act by holding that they do not apply and that the appellant need not meet them. This is set out in the language of the majority opinion as follows:

"If the question [of whether or not there was service performed for remuneration] be answered in the negative, then these brokers would not be in employment under the act, and Rem. Supp. 1943, § 9998-119 g (5) would have no application, and would not be considered, for subsection (5) is an exception provision, applying *and applicable only after it has been determined* that one is in employment under the act." (Italics mine.)

The appellant was *determined* by the commissioner to be under the act. That is why it is before this court contending that the "determination" was erroneous. Any other interpretation makes this court a court of original jurisdiction, supplanting the appeal examiner and performing administrative functions. We have held the exact contrary to be the law. As was said in *MacVeigh v. Division of Unemployment Compensation,* 19 Wn. (2d) 383, 142 P. (2d) 900:

"The right to unemployment compensation is founded upon the statute, not upon the comon law. In determining

questions involving unemployment compensation, the courts exercise appellate jurisdiction as provided by the statute, and in accordance with the procedure outlined therein. The situation is analogous to that presented by the industrial insurance laws. In the case of *Maddox v. Industrial Ins. Commission,* 119 Wash. 21, 204 Pac. 1057, this court said: 'The jurisdiction of the superior court over such controversies is appellate only, and not original.' The cases of *Tennyson v. Department of Labor & Industries,* 189 Wash. 616, 66 P. (2d) 314, and *Ivey v. Department of Labor & Industries,* 4 Wn. (2d) 162, 102 P. (2d) 683, are to the same effect.

"In the case of *Puliz v. Department of Labor & Industries,* 184 Wash. 585, 52 P. (2d) 347, we said:

" 'It has been repeatedly held that the courts have no original jurisdiction in the administration of the workmen's compensation act, and that matters connected with the administration thereof must first be heard and determined by the department of labor and industries.'

"The right to proceed under such a statute as that relied upon by appellant is a statutory, and not a common-law, right. *Mattson v. Department of Labor & Industries,* 176 Wash. 345, 29 P. (2d) 675.

"In the case of *LeBire v. Department of Labor & Industries,* 14 Wn. (2d) 407, 128 P. (2d) 308, we again called attention to the fact that in hearing an appeal from that department the court 'acts only in an appellate capacity and does not exercise original jurisdiction in such controversies.' "

This ruling completely deletes the tests from the act for all purposes. It holds that the appellant does not need to meet the tests to the satisfaction of the commissioner, nor are they to be applied to it when it comes before this court.

1 Washington and Lee L. Rev. 232, 238-9 (1939-40), in referring to *Washington Recorder Pub. Co. v. Ernst,* 199 Wash. 176, 91 P. (2d) 718, said:

"In support of its decision the court quoted verbatim that comment of the Restatement of Agency which was favorable to its position. Had the court read a paragraph further it would have found that ' . . . *The context and purpose of the particular statute controls the meaning* [of the term "servant"] *which is frequently not that which the same word bears in the Restatement of this subject.'* By this process of judicial legislation the court, violating the

well-established rule of statutory interpretation that the legislative definition must prevail, held that a concurrence of the three items in the statutory definition of 'employment' was not essential for exemption under the act. Since the purpose of this broad statutory definition was to prevent the evasions which arise from the refined distinctions attendant upon common law concepts, it would appear that the decision merely raised additional problems of tax avoidance."

Can the *Recorder* case rule that the tests of the statute codified the common-law principles of master and servant, be "interpreted" as harmonious with our other cases, now that the "codified" statute has been judicially repealed? I give you the answer of the writer of this majority opinion in his concurring opinion to *Mulhausen v. Riley, post* p. 811:

"I am further of the opinion that it is not necessary to overrule the case of *Washington Recorder Pub. Co. v. Ernst,* 199 Wash. 176, 91 P. (2d) 718, in order to arrive at the conclusion reached in the majority opinion. . . .

"Regardless of my personal views of whether or not it would have been more logical for this court to hold that the common-law concepts of the relationship of master and servant were applicable in determining whether or not one was an employer under the unemployment compensation act, we have so definitely stated that such concepts were not applicable that it seems to me we must accept the statutory definitions of employer and employment as they are written and *apply them as best we can to the facts in each case.* If this is done *in the manner outlined in the Broderick case, supra,* then, in my opinion, the requirements of the statute will have been met and the claimed employer will not be placed in a position where it is practically impossible for him to show that he is not within the act." (Italics mine.)

I take it that, in our new administrative function of making the determination in each case of employment, we will apply the statute by judicially repealing it as per the majority opinion. At least, it will no longer be "practically impossible for him [an employer] to show that he is not within the act."

In deleting the statutory definition of the subject of the act, how will anyone know what, if anything, is left in the

act? As was said in *Unemployment Compensation Commission v. Jefferson Standard Life Ins. Co.*, 215 N. C. 479, 2 S. E. (2d) 584:

"The scope and purpose of the present act are exceptional in breadth. The draftsmanship of the definition section, which gives flesh and sinew to the whole, shows a carefully considered and deliberate purpose to leap many legal barriers which would halt less ambitious enactments. As far as language will permit it, the act evinces a studied effort to sweep beyond and to include, by redefinition, many individuals who would have been otherwise excluded from the benefits of the act by the former concepts of master and servant and principal and agent as recognized at common-law. In the words of the late *Justice Holmes*, in *Johnson v. U. S.*, 163 Fed., 30 (32), (C. C. A. 1st): 'The legislature has the power to decide what the policy of the law shall be, and if it has intimated its will, however indirectly, that will should be recognized and obeyed. The major premises of the conclusion expressed in a statute, the change of policy that induces the enactment, may not be set out in terms, but it is not an adequate discharge of duty for the courts to say: We see what you are driving at, but you have not said it, and therefore we shall go on as before.' "

The results of the decision in the case at bar are: It unsettles the entire question of administrative law, it judicially repeals the statutory definition of the subject of the act, it continues the confusion caused by the *Recorder* case.

BLAKE, J., concurs with MALLERY, J.

GRADY, J. (dissenting)—The contract between the appellant and each broker provided that such broker was an independent contractor and not a servant, employee, joint adventurer, or partner of appellant. In its brief and argument before this court, the appellant contended that the true relationship between the parties, in so far as it was material, was that of a joint adventure, and as I read the majority opinion that is the conclusion reached.

The contract and the testimony given at the hearing presents a situation from which it may be said that certain elements of each relationship of independent contractors and

joint adventurers existed; but as I read the record it seems clear to me that each broker performed services for appellant in selling real estate, and that he received remuneration therefor in the form of money. The real estate to be sold was listed with appellant. There was no contractual relationship between the brokers and the owner of the real estate. The commission the owner agreed to pay was payable to appellant. If a purchaser had been found who was ready, able, and willing to buy upon the terms specified and the owner had refused to sell, the appellant was the only one who could have brought an action for the commission earned. The broker would be neither a necessary nor a proper party to such action. The money realized upon any judgment entered would have been the property of appellant. Whatever money came from making the sale as a commission belonged to appellant, and the broker had no interest therein other than a contract with appellant that when a sale was finally consummated one half of the commission would be paid to him for his services in making the sale.

The contract between appellant and the individual brokers provided that it and the association created thereby might be terminated by either party at any time upon notice given to the other. This sounds more like discharging or quitting than a dissolution of a partnership or a joint adventure. The secretary of appellant testified it would not be satisfactory to appellant if a broker associated himself with another real estate firm.

When the contract is taken as a whole, and the course of dealing between the appellant and each broker is analysed, it seems plain that the part a broker really played was to take listings of property which had been given to the appellant and turned over to the broker by it, and proceed to negotiate sales; and if a sale was consummated the broker would receive one half of the commission for making the sale. This would constitute services for the appellant for a remuneration paid by him and would constitute employment under the unemployment compensation act. This would place the appellant under the terms of the act unless

it could establish that the broker was within the three exceptions prescribed by Rem. Supp. 1943, § 9998-119g (5) [P. P. C. § 928-1, 19 (g) (5)].

The commissioner of unemployment compensation and placement found and determined that none of the exceptions applied and concluded that the appellant was an employer. The trial court upon appeal sustained the action of the commissioner.

We have decided many times as indicated by the cases cited in the majority opinion that the relationship between the parties involved must be determined by the statute and not by rules of the common law relating to the relationship of master and servant or principal and agent. The only exception is to be found in the case of *Washington Recorder Pub. Co. v. Ernst,* 199 Wash. 176, 91 P. (2d) 718. If it is considered that the *Recorder* case is based upon the theory that the newsboys were independent contractors and therefore not within the act, then it is not in accord with our other cases and to that extent should be overruled. But if it is considered that it is based upon the theory that the relationship between the publishing company and the newsboys was that of vendor and vendees, as suggested in *Mulhausen v. Bates,* 9 Wn. (2d) 264, 114 P. (2d) 995, it is not in its result out of harmony with our other cases.

I think the record supports the findings of fact made by the commissioner and the conclusion thereon reached by both the commissioner and the court, and that the judgment should be affirmed.