[No. 27114. Department One. September 12, 1938.]

JOSEPH P. MCDERMOTT, *Respondent,* v. THE STATE OF WASHINGTON *et al., Appellants.*[1]

[1]Reported in 82 P. (2d) 568.

262

*The Attorney General, Harry L. Parr* and *Lyle L. Iversen, Assistants,* for appellants.

*Joseph P. McDermott, pro se.*

*L. Presley Gill, amicus curiae.*

GERAGHTY, J.—The plaintiff, who conducts a barbershop in the city of Seattle, instituted this action for a declaratory judgment establishing the status of the barbers, manicurists, and bootblacks performing service in his shop under Laws of 1937, chapter 162, p. 574, Rem. Rev. Stat. (Sup.), § 9998-101 [P. C. § 6233-301] *et seq.,* known as the Washington unemployment compensation act. The state of Washington, the director of the department of social security, the supervisor of the unemployment compensation division of that department, and the attorney general were made defendants.

The case was tried to the court, and a decree was entered adjudging that the persons rendering service in the plaintiff's shop were not engaged in employment as defined in the act. The defendants appeal.

Except for a short intermission prior to 1931, the respondent has conducted a barbershop in the city of Seattle since 1909. At the time of the trial, fifteen barbers, two bootblacks, and two manicurists were rendering service in the shop, although it contained only thirteen barber chairs. The respondent testified that, about the time the national recovery act became effective, he entered into "oral lease agreements" with "lessee barbers," the substance of the agreement being that he, as lessor, was to supply each barber with a certain chair, together with all installed barbershop equipment necessary for the practice of barbering, as well as all supplies required; that each lessee barber, as consideration for the use of the chair, equipment, and supplies, agreed to pay to the respondent forty per

cent of his gross receipts from barber service performed on the leased chair.

Prior to the making of these oral lease agreements, respondent's shop was conducted on the customary plan under which each barber employed was paid for his service sixty per cent of his gross receipts. The lease agreements continue in force for fifty-two weeks, but are subject to termination by either party on one week's notice. Respondent has a right to suspend the lease without notice under certain conditions.

"If a man did appear on the scene slightly intoxicated, or anything like that, I would tell him that the provisions of the lease was that the barber should comply with the law, and the law says you couldn't be under the influence of liquor, and I am suspending the lease until you come back perfectly sober. That would be the suspension. Q. You don't have to give any notice when you want to suspend it? A. Under those circumstances, no. When they have that, liquor on their breath, I don't want them to barber in my shop. . . . Q. Do you have any standards of quality for the work in your shop that your barbers have to live up to? A. Every barber that I have is a competent barber. He has passed an examination and demonstrated that he is skillful and sufficiently competent to pass an examination. If it were not so, *I could not have him in my employ.*"

While a certain chair is leased to a barber, he is not strictly confined to work on that chair, but may move to unoccupied chairs more strategically situated for attracting custom. A barber leasing a chair cannot keep others from using it when he is not employed in the shop. Theoretically, his lease is suspended when he leaves the chair, and then the temporary occupant of that chair has it under lease for the time being, not, however, as subtenant of the first lessee, but as tenant of the respondent. One of the barbers in the shop works on three chairs in the course of a day.

When a barber working on a chair advantageously placed for business leaves the shop, another using a chair less advantageously placed may move to the vacant chair; and the chair vacated by the second barber may be taken by a third, and so on.

"Q. Do you mean that any of these people have no right to object to any other barber using their chair when they are gone? A. Absolutely not. They have no objection to that. . . . Q. Do we understand these men have the right for these chairs only when they are on the job? Anyone else in the shop can use the chairs when they are gone? A. Yes, that is true. . . . Q. And the man who owns that chair has no right to keep them from doing it when he is gone? A. No, and the oral agreement is perfectly clear."

The case of Mr. Hedrick, one of the barbers, is illustrative. Respondent testified that, when Hedrick sought a place in his shop,

"I said, 'I haven't a chair to lease you, but I could lease you the opportunity until my brother comes in the morning on his chair; then you can go to your lunch, and then when you come back, then you can take Mr. Dickson's chair, who is next to my brother, and in the event that I am gone you can take my chair.' And he entered into such an oral lease agreement and was happy so to do, . . ."

Respondent has a single lease agreement with the two bootblacks, who serve customers in the shop and do the usual porter work. Under the agreement, they are to have all of their earnings up to $1,248 a year; all earnings above that sum, not including gratuities, are shared by the parties, one-half going to the respondent and one-half to the bootblacks. Each bootblack is permitted to draw two dollars a day from the shop against his earnings.

Respondent's testimony is not clear as to his arrangements with the manicurists. While he states that they are to have all they take in for manicure service, he

has some agreement by which, when they take in less than $8.50 a week, the shop advances enough to make up that amount; in other words, they are guaranteed that sum each week, but are to furnish their own supplies.

To outward appearances, the business in the shop is conducted like other barbershops. The barbers give to their patrons slips bearing the heading "McDermott's Barber Shop," and itemizing the services rendered and charges made. At the bottom of these slips is printed the admonition "Please Pay Cashier." The respondent himself, when not engaged, takes the cash; otherwise, the manicurists attend to the cash, or, in their absence, some of the barbers on duty.

Explaining his reason for making oral lease agreements instead of written, the respondent testified:

"The reason of having an oral lease agreement instead of having a written lease, if I had wanted to make a specific lease for a certain chair, I would have entered into a written lease because then the language of the lease is itself the best evidence. The reason of the oral lease is because there are these many things."

Under the system commonly used in other barbershops, the journeyman barber is paid sixty per cent of the charges collected for his services, forty per cent being retained by the proprietor. This is the division of receipts followed in the respondent's shop. While the mechanical process of collecting and disbursing the earnings of the barbers is the same in the respondent's shop as in other shops, he contends that, in his shop, he does not pay his barbers sixty per cent of their earnings, but that they pay him forty per cent for the use of the chairs.

The respondent testified that the barbers could get their money daily or weekly, as they desired, but it is, nevertheless, a fact that the money taken in is paid

to a cashier, and, when the barbers receive their share, it is given to them by the respondent as proprietor of the shop. He is admittedly the owner of the shop, which carries signs advertising the fact. None of the barbers working in the shop has his name displayed there in any way except in his barber's license posted at his chair.

It is unnecessary to determine whether the common law relation of master and servant exists between respondent and the barbers and other operatives in his shop, because the parties are brought within the purview of the unemployment compensation act by a definition more inclusive than that of master and servant. The purpose of the act, as declared in § 2, p. 574, Rem. Rev. Stat. (Sup.), § 9998-102 [P. C. § 6233-302], is to prevent the recurrence of unemployment in years to come, as well as to furnish protection against that hazard by the accumulation of funds during periods of employment. To this end, § 7, p. 587, Rem. Rev. Stat. (Sup.), § 9998-107 [P. C. § 6233-310], of the act provides:

"(1) On and after January 1, 1937, contributions shall accrue and become payable by each employer for each calendar year in which he is subject to this act, with respect to wages payable for employment (as defined in section 19 (g)) occurring during such calendar year, such contributions shall become due and be paid by each employer to the treasurer for the fund in accordance with such regulation as the director may prescribe, and shall not be deducted, in whole or in part, from the remuneration of individuals in his employ; . . ."

Section 19 (g), p. 609, Rem. Rev. Stat. (Sup.), § 9998-119 [P. C. § 6233-317], provides, in part:

"(1) 'Employment,' subject to the other provisions in this subsection, means service, including service in interstate commerce, performed for wages or under

any contract of hire, written or oral, express or implied. . . .

"(5) Services performed by an individual for remuneration shall be deemed to be employment subject to this act unless and until it is shown to the satisfaction of the director that:

"(i) Such individual has been and will continue to be free from control or direction over the performance of such service, both under his contract of service and in fact; and

"(ii) Such service is either outside the usual course of the business for which such service is performed, or that such service is performed outside of all the places of business of the enterprises for which such service is performed; and

"(iii) Such individual is customarily engaged in an independently established trade, occupation, profession or business, of the same nature as that involved in the contract of service."

Applying the statutory definition to the facts as we have outlined them, it is seen (i) that the operatives in the respondent's shop are not, in fact, free from the control or direction of the respondent over the performance of their service; (ii) that the service is not rendered outside of the usual course of the respondent's business or outside his barbershop; and (iii) that the operatives in the barbershop are not engaged in an independently established trade, occupation, profession, or business of the same nature as that involved in their contract of service.

We are clear that the so-called oral lease agreements are, in fact, contracts of service within the meaning of the act. To hold otherwise would be to ignore the realities of the case as disclosed by the respondent's own testimony.

The judgment is reversed, and the cause is remanded to the superior court, with direction to enter a judgment declaring that the operatives in respondent's

barbershop are engaged in employment by him within the purview of the unemployment compensation act, chapter 162, Laws of 1937.

STEINERT, C. J., MAIN, HOLCOMB, and SIMPSON, JJ., concur.