[Nos. 29322, 29339. *En Banc.* April 13, 1945.]

THE STATE OF WASHINGTON, *on the Relation of R. W. Mulhausen, Plaintiff,* v. THE SUPERIOR COURT FOR THURSTON COUNTY *et al., Respondent.*

R. W. MULHAUSEN, *Appellant,* v. E. B. RILEY, *as Commissioner of Unemployment Compensation and Placement, Respondent.*[1]

[1]Reported in 157 P. (2d) 938.

812

C. P. Borberg, for appellant.

The Attorney General and George W. Wilkins, Assistant, for respondent.

BLAKE, J.—The main issue presented on this appeal is identical with that decided by this court in Mulhausen v. Bates, 9 Wn. (2d) 264, 114 P. (2d) 995: whether appellant is an employer in contemplation of the unemployment compensation act (Rem. Rev. Stat. (Sup.), §§ 9998-101, 9998-123 [P. C. §§ 6233-301, 6233-323]), of certain individuals serving him in the sale of oleomargarine in this state.

Appellant, doing business as R. W. Mulhausen Company, is a distributor of oleomargarine. His principal place of business is in Portland, Oregon. His principal field of distribution is in the state of Washington. At the time the unemployment compensation act became effective in 1937, and since, he has had numerous agents, or distributors (eight or more persons), located at various points in this state, who have been engaged in taking orders for, and making delivery of, oleomargarine. These persons did not handle oleomargarine exclusively. They also handled other food products for other manufacturers or producers. They paid their own expenses and performed services for Mulhausen as and when their own convenience was best subserved. For their services, they were compensated by a commission based upon the purchase price of the oleomargarine sold. The territory in which they worked was defined only in a general way.

In getting oleomargarine to the ultimate consumers, these agents, or distributors, would make arrangements with retail grocers to act as "grocer agents." The latter would take orders from the ultimate consumers on order blanks furnished by Mulhausen. The distributors would pick up these

orders with a "deposit" from the grocer agents. This deposit was in an amount of the purchase price to the ultimate consumer, less a commission held out for himself by the grocer agent. The distributor would transmit the orders and deposits (less a commission held out for himself) to Mulhausen at Portland. Mulhausen would fill the orders in separate parcels with the name of the ultimate consumer on each. A number of such parcels would usually be shipped at the same time—consigned either to the distributor or to the R. W. Mulhausen Company as consignee. In either case, the distributor would receive the consignment and deliver the parcels to the grocer agents to whom the ultimate consumers had given their orders. The latter received the oleomargarine from the grocer agents in the "original package" shipped by Mulhausen from Portland.

This complex method of distribution was designed to maintain the integrity of the transaction as a shipment in interstate commerce. The purpose was to escape the payment of the excise tax of fifteen cents a pound upon the sale of butter substitutes under the Laws of 1931, chapter 23, p. 77, § 2 (Rem. Rev. Stat., § 8358-2 [P. C. § 1880-2]).

The necessity for maintaining the interstate character of the shipments and the consequences of failure to do so is best told by Mulhausen himself. He testified:

"A. We did get out order forms and when any agents started handling oleomargarine in any capacity or in any territory, we furnished him these order forms to use so that the orders could come in and that was for the purpose, of course, of keeping the business in accordance with the rules of the interstate commerce shipments . . ." Q. I will ask you . . . if it is not a fact that Regulation 9 of the Bureau of Internal Revenue specifies in some considerable detail the manner in which oleomargarine may be handled without incurring a tax liability to the handlers, save and except the original seller. A. It does. There is a possible chance of the agent handling oleomargarine in the territory but if we don't keep our orders in shape they may be questioned and fined by the Internal Revenue Department . . .

"Q. What has been the experience of your company in respect to merchandise, if any, which was returned or per-

haps held for a period of time by the representatives? . . . A. Well . . . we went over that very carefully with the Internal Revenue Department and in cases where an agent . . . failed in any way to deliver to a consumer, that merchandise has been returned to our office at our expense . . . For the purpose of protection on our interstate commerce requirements, it is our merchandise until it reaches the ultimate consumer. Q. And you so consider it? A. Yes. Q. Then the money collected, whether picked up by [from] the ultimate consumer or whether it is picked up from the grocer agent, that money represents the price that is to be paid to you, it is considered your money? A. It is considered our money, yes, the money that is to be for us is considered our money. . . .

"Q. If that representative had walked off with that money and had not accounted for it, he would be taking your money, would he not? A. I think I would be the loser, naturally. Q. It was not, then, a matter of debit and credit on account, it was a matter of collecting your money for you for the merchandise that was shipped? A. Well, probably you are right there."

In *Mulhausen v. Bates, supra,* we held that one Farmer, who had been employed by Mulhausen under circumstances and conditions essentially the same as the agent distributors in this case, was, after being discharged, entitled to unemployment compensation. Such holding was necessarily predicated upon the assumption that the commissioner's findings that Mulhausen was an "employer," as defined by Rem. Rev. Stat. (Sup.), § 9998-119 [P. C. § 6233-317] (f) (1) (now amended by Rem. Supp. 1943), and that the service rendered by Farmer constituted "employment," in contemplation of Rem. Rev. Stat. (Sup.), § 9998-119 (g) (5) (Laws of 1937, chapter 162, p. 609, § 19), were supported by substantial evidence; otherwise, Farmer would not have been entitled to unemployment compensation.

In this case, the issue is the same as in that. It arises, however, upon Mulhausen's appeal from a notice of assessment made by the commissioner for contributions to the unemployment compensation fund. The assessment was in the amount of $2,007.96. It was based on commissions paid agent distributors, as shown by Mulhausen's own rec-

ords, and covered the period from March 16, 1937, the effective date of the unemployment compensation act, to September 30, 1941.

At the hearing before the appeal tribunal, evidence was adduced by Mulhausen showing that the assessment was based on remuneration paid to one person who operated with him (Mulhausen) on a partnership basis and to certain others who either were not under contract with him or who resided in Idaho and operated exclusively in that state. The appeal tribunal accordingly reduced the assessment in so far as it was based on remuneration to these persons; so reduced, the assessment stands at $1,869.80.

Mulhausen appealed from the decision to the superior court for Thurston county, which affirmed the decision of the appeal tribunal and entered judgment for $1,869.80.

 If the statutory definitions of employer and employment are accepted at face value, it is clear that Mulhausen is liable for contributions to the unemployment compensation fund in the amount found due by the appeal tribunal—$1,869.80. The appellant contends, however, that the relationship of employer and employee, as defined by the statute, was circumscribed and limited by this court in the decision of the case of *Washington Recorder Pub. Co. v. Ernst,* 199 Wash. 176, 91 P. (2d) 718, to the common-law concepts attending the relationship of *master and servant.*

It is quite true that language was used in that decision upon which such contention may well be made; however, the language used was out of harmony with the interpretation of the statutory definition of employer and employment as laid down by this court in the prior case of *McDermott v. State,* 196 Wash. 261, 82 P. (2d) 568. In that case, we expressly stated that the statutory definitions embraced relationships which were outside of and beyond the common-law concepts of the relationship of master and servant.

In *Mulhausen v. Bates, supra,* we reverted to the statutory definitions of employer and employment as interpreted in *McDermott v. State, supra.* Since then, we have accepted the statutory definitions at their face value in a number of cases. *In re Foy,* 10 Wn. (2d) 317, 116 P. (2d) 545; *Sound*

*Cities Gas & Oil Co. v. Ryan,* 13 Wn. (2d) 457, 125 P. (2d) 246; *In re Hillman Inv. Co.,* 15 Wn. (2d) 452, 131 P. (2d) 160; *Unemployment Compensation Department v. Hunt,* 17 Wn. (2d) 228, 135 P. (2d) 89. In the case last cited, we said, p. 236:

"We have upon a number of occasions held that our unemployment compensation act does not confine taxable employment to the relationship of master and servant, but brings within its purview many individuals who would otherwise have been excluded under common-law concepts of master and servant, or principal and agent."

In view of these decisions, it is apparent that the court is not committed to the doctrine of the *Recorder* case in so far as it would limit the relationship of employer and employee, as defined in the unemployment compensation act, within the bounds of common-law concepts relating to master and servant. In so far as the decision in the *Recorder* case does so limit the statutory definitions of employer and employee, the case should be overruled.

The appellant challenges the power of the trial court to enter judgment for the amount of the assessment ($1,869.80) as found due by the appeal tribunal. Among other provisions, Rem. Rev. Stat. (Sup.), § 9998-106 (i) (Laws of 1939, chapter 214, p. 829, § 4 (i)), contains the following:

"If the court shall determine that the commissioner has acted within his power and has correctly construed the law, the decision of the commissioner shall be confirmed; . . ."

We think the judgment of the trial court amounts to nothing more than a confirmation of the decision of the commissioner. For the decision of the appeal tribunal is, in contemplation of the statute, the decision of the commissioner. Rem. Supp. 1941, § 9998-114c (Laws of 1941, chapter 253, p. 906, § 11), provides:

"At any time after the Commissioner shall find that any contribution or the interest thereon have become delinquent, the Commissioner may issue a notice of assessment specifying the amount due, which notice of assessment shall

be served upon the delinquent employer in the manner prescribed for the service of summons in a civil action, except that if the employer cannot be found within the state, said notice will be deemed served when mailed to the delinquent employer at his last known address by registered mail. If the amount so assessed is not paid within ten days after such service or mailing of said notice, the Commissioner or his duly authorized representative shall collect the amount stated in said assessment by the distraint, seizure and sale of the property, goods, chattels and effects of said delinquent employer. There shall be exempt from distraint and sale under this section such goods and property as are exempt from execution under the laws of this state."

The judgment of the court adds nothing to the power conferred by the statute upon the commissioner to assess and collect the amount due.

■■ Appellant contends, however, that the procedure provided for in the above-quoted statute is a denial of due process of law in so far, at least, as it affects the contributions sought to be collected under the assessment made by the commissioner in this instance. This contention is grounded upon the statutory method of collection provided for in the original act—which was by a civil action.

The contention is untenable. The contributions required to be paid by employers into the unemployment compensation fund are excise taxes. *Bates v. McLeod,* 11 Wn. (2d) 648, 120 P. (2d) 472; *Steward Mach. Co. v. Davis,* 301 U. S. 548, 81 L. Ed. 1279, 57 S. Ct. 883, 109 A. L. R. 1293. It is inherent in the exercise of sovereign power to require taxes to be paid under summary process. *Miller v. Henderson,* 50 Wash. 200, 96 Pac. 1052; *Scottish Union & Nat. Ins. Co. v. Bowland,* 196 U. S. 611, 49 L. Ed. 619, 25 S. Ct. 345. The taxpayer has no vested right in any particular process: If, at some stage of the proceedings, he is given notice and has an opportunity to be heard, and if the procedure established by existing law is substantially followed in assessment and collection, the requirements of the due process clause of the constitution are satisfied. 1 Cooley on Taxation (4th ed.) 329, § 143; 3 Cooley on Taxation (4th ed.) 2263, 2264,

§§ 1118, 1119; *Reese v. Thurston County*, 154 Wash. 617, 283 Pac. 170; *Miller v. Henderson, supra; Scottish Union & Nat. Ins. Co. v. Bowland, supra; Palmer v. McMahon*, 133 U. S. 660, 33 L. Ed. 772, 10 S. Ct. 324; *McMillen v. Anderson*, 95 U. S. 37, 24 L. Ed. 335. In the case last cited, it was said, p. 41:

"The mode of assessing taxes in the States by the Federal government, and by all governments, is necessarily summary, that it may be speedy and effectual. By summary is not meant arbitrary, or unequal, or illegal. It must, under our Constitution, be lawfully done.

"But that does not mean, nor does the phrase 'due process of law' mean, by a judicial proceeding. The nation from whom we inherit the phrase 'due process of law' has never relied upon the courts of justice for the collection of her taxes, though she passed through a successful revolution in resistance to unlawful taxation. We need not here go into the literature of that constitutional provision, because in any view that can be taken of it the statute under consideration does not violate it. It enacts that, when any person shall fail to refuse or pay his license tax, the collector shall give ten days' written or printed notice to the delinquent requiring its payment; and the manner of giving this notice is fully prescribed. If at the expiration of this time the license 'be not fully paid, the tax-collector may, without judicial formality, proceed to seize and sell, after ten days' advertisement, the property' of the delinquent, or so much as may be necessary to pay the tax and costs."

And in *Palmer v. McMahon, supra*, the court said, p. 669:

"The power to tax belongs exclusively to the legislative branch of the government, and when the law provides for a mode of confirming or contesting the charge imposed, with such notice to the person as is appropriate to the nature of the case, the assessment cannot be said to deprive the owner of his property without due process of law."

Appellant's contention that the judgment—merely confirming, as it does, the action of the commissioner—violates the due process clause of the constitution, is without substance.

The judgment is affirmed.

MALLERY and GRADY, JJ., concur.

JEFFERS, J. (concurring)—I am in accord with the result reached in the majority opinion. However, I am unable to agree with some of the statements contained in the opinion and therefore desire to state briefly the reasons for my concurrence:

I am in agreement with the majority opinion as written in so far as it holds, under the facts in this case and the law applicable thereto, that the trial court had the power to enter judgment for the amount of assessment as found by the appeal tribunal.

On the authority of *Mulhausen v. Bates,* 9 Wn. (2d) 264, 114 P. (2d) 995, I am in agreement with the result reached in the majority opinion to the effect that Mulhausen is an employer under the unemployment compensation act. I am also of the opinion that the essential facts in the last-cited case are the same as in the instant case, and, unless the cited case is overruled, it is controlling herein.

I am further of the opinion that it is not necessary to overrule the case of *Washington Recorder Pub. Co. v. Ernst,* 199 Wash. 176, 91 P. (2d) 718, 124 A. L. R. 667, in order to arrive at the conclusion reached in the majority opinion. We accepted the interpretation placed upon the *Recorder* case in *Mulhausen v. Bates, supra,* in practically every case decided subsequent to the last-cited case, and, if such interpretation be now accepted, the *Recorder* case, *supra,* in my opinion, does not conflict with the result reached herein.

I am further of the opinion that the cases of *Broderick, Inc. v. Riley, ante* p. 760, 157 P. (2d) 954, and *Curtis v. Riley, post* p. 951, 157 P. (2d) 975, are factually different from either of the *Mulhausen* cases, and that the decisions in the *Broderick* and *Curtis* cases would not, in effect, be over-ruled by the result reached in the majority opinion in the instant case.

Regardless of my personal views of whether or not it would have been more logical for this court to hold that the common-law concepts of the relationship of master and servant were applicable in determining whether or not one was an employer under the unemployment compensation act, we have so definitely stated that such concepts were not

applicable that it seems to me we must accept the statutory definitions of employer and employment as they are written and apply them as best we can to the facts in each case. If this is done in the manner outlined in the *Broderick* case, *supra,* then, in my opinion, the requirements of the statute will have been met and the claimed employer will not be placed in a position where it is practically impossible for him to show that he is not within the act.

BEALS, C. J., and ROBINSON, J., concur with JEFFERS, J.

MILLARD, J. (dissenting)—Robert Bruce Farmer, who last worked as a distributor or salesman of oleomargarine for R. W. Mulhausen, an individual doing business as R. W. Mulhausen Company, of Portland, Oregon, filed claim for unemployment compensation under Rem. Rev. Stat. (Sup.), § 9998-106 [P. C. § 6233-306] (Laws of 1937, chapter 162, § 6, p. 582, as amended by Laws of 1939, chapter 214, § 4, p. 825). On Mulhausen's appeal from judgment of the superior court for Thurston county affirming decision of the commissioner of unemployment compensation that claimant was eligible for benefits, we held (*Mulhausen v. Bates,* 9 Wn. (2d) 264, 114 P. (2d) 995) that the relation between Farmer and Mulhausen was one of employer and employee under the unemployment compensation act.

Subsequent to decision in *Mulhausen v. Bates, supra,* and after an examination by the commissioner of Mulhausen's records at Portland, Oregon, where Mulhausen resides and conducts his business, the commissioner levied an assessment of approximately two thousand dollars against Mulhausen on the theory that certain individuals who were connected with Mulhausen's oleomargarine sales within this state were employees under the unemployment compensation act.

From the commissioner's decision affirming finding of the appeal tribunal of the unemployment compensation division holding Mulhausen to be a liable employer and providing that the commissioner is entitled to recover the sum levied, Mulhausen appealed to the superior court for Thurston county, which affirmed the commissioner's decision and

entered a judgment awarding recovery by the commissioner from Mulhausen of $2,243.76, together with interest on the judgment and attorney's fees, and that execution issue thereon.

Mulhausen appealed from that judgment and also made an original application to this court for writ of certiorari by which he seeks a review of that portion of the judgment awarding a money judgment against him.

Counsel for appellant contends that the trial court, sitting for the sole purpose of determining the correctness of the commissioner's decision that appellant owed to the state of Washington a certain amount of money, was without jurisdiction to enter a judgment in that action awarding recovery against appellant. It is argued that certiorari is the proper remedy, and that a peremptory writ should issue restraining the court and the commissioner from enforcing collection of the judgment awarding recovery against appellant; that to not require the commissioner to attempt collection of the amount involved only by the commencement of a civil action with the state of Washington as party plaintiff and appellant as party defendant and observance of prescribed procedural steps, would permit the taking of appellant's property without due process of law.

Under the statute (Rem. Rev. Stat., § 1002 [P. C. § 7418]) which provides that certiorari will lie from this court to the superior court when the latter is proceeding in excess of its jurisdiction, "or to correct any erroneous or void proceeding, or a proceeding not according to the course of the common law, and there is no appeal, nor in the judgment of the court, any plain, speedy and adequate remedy at law," the office of certiorari is not alone to review those errors made in excess of or without jurisdiction, but it lies also, in proper cases, to review errors of law or of fact where the inferior tribunal has jurisdiction.

The mere existence of a remedy by appeal does not, in this state, preclude the issuance of the writ of certiorari. It is not so much the question of jurisdiction or lack of jurisdiction, but the adequacy of the remedy by appeal, that furnishes the test to be applied. See *State ex rel. Schlosberg*

*v. Superior Court,* 106 Wash. 320, 179 Pac. 865. The writ is uniformly denied when the remedy by appeal is adequate. The matter for review may, in the case at bar, be brought up both upon appeal and by a writ of certiorari. A reversal upon appeal would necessarily disclose the adequacy of the appeal and necessitate quashing of the writ and dismissal of the certiorari proceeding.

The writ of prohibition arrests the proceedings of an in-ferior tribunal when such proceedings are without or in excess of the jurisdiction of such tribunal (Rem. Rev. Stat., § 1027 [P. C. § 8386]); and the writ may be issued to an inferior tribunal in all cases where there is not a plain, speedy, and adequate remedy in the ordinary course of law (Rem. Rev. Stat., § 1028 [P. C. § 8387]).

The statute (Rem. Rev. Stat. (Sup.), § 9998-106) specifi-cally provides that, in cases under the unemployment com-pensation act, appeal shall lie from the judgment of the superior court to this court as in other civil cases. As ap-pellant has an adequate remedy by appeal, he is not entitled, under the rule well settled in this state, to writs of cer-tiorari and prohibition. *Mulhausen v. Bates,* 9 Wn. (2d) 264, 114 P. (2d) 995; *State ex rel. Burkhard v. Superior Court,* 11 Wn. (2d) 600, 120 P. (2d) 477; and *State ex rel. O'Brien v. Police Court,* 14 Wn. (2d) 340, 128 P. (2d) 332.

Counsel for respondent argue, citing as sustaining au-thority *Unemployment Compensation Department v. Hunt,* 17 Wn. (2d) 228, 135 P. (2d) 89, that service performed by an individual for remuneration must be deemed "employ-ment" under the unemployment compensation statute (Laws of 1937, chapter 162, p. 574, Rem. Rev. Stat. (Sup.), § 9998-119a(g)(5) [P. C. § 6233-317]) unless the person challenging the relationship of employer and employee es-tablishes all three of the exceptions enumerated in the statute, for the reason that the exceptions are stated conjunc-tively, not disjunctively. The pertinent portions of the statute read as follows:

"Services performed by an individual for remuneration shall be deemed to be employment subject to this act unless and until it is shown to the satisfaction of the director that:

"(i) Such individual has been and will continue to be free from control or direction over the performance of such service, both under his contract of service and in fact; and

"(ii) Such service is either outside the usual course of the business for which such service is performed, or that such service is performed outside of all the places of business of the enterprises for which such service is performed; and

"(iii) Such individual is customarily engaged in an independently established trade, occupation, profession or business, of the same nature as that involved in the contract of service." Laws of 1937, chapter 162, § 19 (g) (5).

The term "remuneration" is included within the definition of "wages":

" 'Wages' means remuneration payable by employers for employment. 'Remuneration' means all compensation payable for personal services, including commissions and bonuses and the cash value of all compensation payable in any medium other than cash. . . ." Laws of 1937, chapter 162, § 19 (m).

Counsel for appellant argues that, under terms of appellant's contract with his oleomargarine distributors, it is clear that the parties intended—and they so functioned—the status of the distributors within this state to be that of independent contractors; and that the unemployment compensation statute has not so altered long-established concepts to such an extent as to distort the relationship between appellant and his oleomargarine representatives into service performed for wages or under any contract of hire.

Counsel for respondent counter that subds. (i), (ii), and (iii) were intended by the legislature as part of the definition of employment; therefore, any personal activities rendered with hope of compensation from any source were within purview of the act unless all three exceptions were fully met.

It is a sufficient answer to any argument that, in the absence of any charge of abuse of discretion, the court may not substitute its judgment for that of the commissioner in questions arising under the unemployment compensation statute, to say there has been no substitution by the court

of its discretion for that of the commission. The question presented is one of law—the facts are undisputed—hence, there is no room for any exercise of discretion by any administrative officer.

It is not necessary to cite authorities to sustain the self-evident proposition that the legislature could not deprive our courts of their inherent and constitutional jurisdiction to determine the legality of the exaction by respondent from appellant of contributions which appellant contends is not valid for the reason that appellant, under the unemployment compensation statute, is exempt therefrom.

It is clear from the facts, which are as follows, that the relationship between appellant and his distributors is not that of employer and employee, master and servant, or the performance of service for wages or under any contract of hire, but that the status of the distributors is that of independent contractors:

R. W. Mulhausen is a wholesale distributor of oleomargarine and other food products with his principal place of business in Portland, Oregon. The sale of oleomargarine is promoted and handled in this state through agents or representatives selected by appellant Mulhausen. Some of those agents were selected by appellant or his representatives after personal interviews. They were assigned specific territories and given instructions regarding the proper method of handling the sale of oleomargarine in order to avoid the payment of a tax of fifteen cents a pound imposed upon butter substitutes sold in this state. Occasionally, one of these representatives left his territory and turned his business over to a friend or acquaintance, who would communicate by mail with appellant and arrange to continue the distribution of oleomargarine. Sometimes a representative of appellant engaged the services of one or more sub-agents to distribute the product in his territory. Appellant never came into personal contact with some of these individuals, but he filled their orders in the same manner as he filled those of his regularly appointed agents.

All agents were informed of and expected to follow the procedure outlined by appellant, which was, substantially,

as follows: The agents made arrangements in their respective territories with certain retail merchants designated as grocer-agents to handle oleomargarine. The latter were given order blanks furnished by appellant which were to be signed by the consumer, specifying the number of pounds of oleomargarine he or she was ordering from appellant. At regular intervals, these orders were picked up by the agents, together with the amount due from the grocer. The orders and money, less the agents' commission, were forwarded to appellant's office in Portland. The orders were filled and the oleomargarine was shipped by express or auto freight to appellant in care of the agents. The shipments were picked up by the agents, who delivered the oleomargarine to their various grocer-agents for delivery to the consumers. A statement from appellant was also given to the grocer-agent showing the number of pounds of oleomargarine in each package and the names of the customers who had ordered it. This method of distribution was necessary to keep the transactions in interstate commerce and thus avoid the state and Federal tax.

All agents, whether appointed originally by appellant or who acquired territories from other agents, were instructed as to the proper method of distribution and were expected to follow it. Appellant constantly insisted that his agents or representatives follow the proper method, as any difficulties with the state or Federal authorities caused considerable loss of business, both to the agents and to appellant.

Subagents, such as those individuals working in the Spokane territory, were billed individually for shipments and picked up these shipments as agents of appellant, although they turned in their orders and money, less their commissions, to the principal agent.

The state was divided into roughly designated territories, and agents were assigned to such territories; or, if there were several areas without agents, they were permitted to choose the one they preferred. Occasionally, an individual with a route already established for the sale of other products would take appellant's oleomargarine as a side line.

Agents were expected to confine their efforts to the territories assigned to them.

The retail price of oleomargarine was fixed by appellant and was changed from time to time, as was the agent's commission, which ranged from two and one-half cents to three and one-half cents a pound. A blanket fidelity bond was taken out on all agents, but that practice was discontinued in November, 1938. The agents paid their own expenses, operated their own automobiles, and were not required to take out insurance thereon naming the appellant as an insured. Nearly all of the agents sold other products, some of which were distributed by appellant. There were no restrictions on the number of other products that might be handled by an agent. All of the merchandise except oleomargarine was purchased by the agents from distributors and resold by them to the stores in their respective territories. None, the commissioner found, was handled in the same manner as oleomargarine.

Appellant did not insist on the agents meeting a certain quota of sales, but did assign quotas and offer prizes to those making the highest percentage of their respective quota. Effective January 1, 1939, contracts were executed by appellant and his agents, pertinent portions of which contract read as follows:

"That, WHEREAS, the Distributor [appellant] is engaged at Portland, Oregon, in the direct sale in interstate commerce to consumers in the State of Washington, of oleomargarine, wherein and whereby consumers thereof in Washington place their orders in writing with their neighborhood stores for the future delivery of their oleomargarine requirements directly from the stock of the Distributor at Portland, Oregon; and

"WHEREAS, the said Distributor, through his Agents in the said State of Washington, collects said orders, has them forwarded to him at Portland, where he appropriates specific merchandise to each particular order, and marks such merchandise with the name of the individual purchaser, and thereafter by common carrier forwards the same for delivery to the persons placing such orders, through the grocer-agent with whom said orders are placed; and

"WHEREAS, the Distributor desires to contract for the ser-

vices of the Agent in the territory comprising ...............................
(counties) and the Agent desires to serve the said territory
for the Distributor in the manner herein set out;

"Now, therefore, in consideration of the premises, and of
the mutual agreements herein contained, it is mutually
agreed as follows:

"1. That the Distributor agrees to and does contract with
the Agent to act for the Distributor in the said territory,
and to pay to the Agent as his sole compensation for such
services the sum of three cents per pound on all oleomar-
garine forwarded through him in said territory.

"2. That the Agent shall have the sole right of represen-
tation of the Distributor in the described territory.

"3. The duties of the Agent shall consist of promoting the
sale of the Distributor's oleomargarine in said territory; of
collecting and forwarding to the Distributor orders for said
oleomargarine; of receiving from the carrier the merchan-
dise appropriated by the Distributor, and making delivery
thereof either directly to the consumer, or to the grocer-
agent through whom said orders are received, as the case
may be (Unless, at the option of the Distributor said de-
liveries be made by parcel-delivery or other carrier); and
of making prompt and full remittance to the Distributor of
all monies due to him on account of such transactions.

"4. The agent shall make collection in advance on all
orders of the net amount, first deducting the Agent's com-
mission above stated, after having permitted the grocer-
agent to make similar deduction of his commission.

"5. The Distributor shall have the sole authority to make
or fix the price of the product to the consumer, and the
Agent shall neither vary therefrom, nor permit the grocer-
agent to vary the price.

"6. In sales promotion, the Agent shall have authority to
appoint sub-agents for the Distributor, to be known as
grocer-agents, solely on the basis herein outlined and not
otherwise.

"7. The agent shall pay his own traveling and other ex-
penses, at his own cost, and the Distributor shall have no
liability therefor.

"8. It is specifically agreed that no title to the merchan-
dise shall at any time be vested in the Agent; that the Agent
shall neither make nor purport to make direct sales or sales
in his own name, nor in any manner conduct the business
of the Distributor in violation of the Regulations of the
Bureau of Internal Revenue of the United States.

"9. In the event of the inability of the agent to make collection in advance upon orders forwarded to the Distributor, it is agreed that for the purpose of affording security to the Distributor for the collection and remittance of the net price of said merchandise, less commissions, or the return of undelivered merchandise, the Agent shall, upon receipt of any shipment which in whole or part has not been paid in advance, deposit with the carrier delivering the same to him, a sum of money equal to the unpaid portion of said shipment, to be by the carrier remitted to the Distributor as in the case of a C. O. D. shipment.

"10. By this agreement, and the execution thereof, it is understood and agreed that the relation between the Distributor and the Agent shall be that of principal and independent contractor; that the Distributor shall have no detail supervisory right over the Agent; that the latter shall be at liberty to arrange his work and be responsible only to the Distributor for the result, to the end that the relation of employer and employee shall not exist. It is further understood and agreed that for the purpose of a definiteness and certainty this is a continuation of the oral contract which has heretofore existed between the parties hereto.

"11. That this contract may be terminated at any time at the option of either party upon one week's notice in writing to the other, provided, however, that in the event of the failure of the Agent to service said territory faithfully and regularly, or in the event of his failure to make full and prompt remittance to the Distributor of any sums of money due or to become due and belonging to him, then and in either event, the Distributor may terminate without notice this contract."

Some of the courts hold that the three subdivisions (i), (ii), (iii) upon which counsel for the commissioner rely, are merely exclusions to the general definition of employment and apply only to those who fall within the ordinary definition of "employer"; that is, the three exceptions do not apply until after it has been determined that the service in question is within the term "employment" and that until it has been so determined the limitations have no application whatsoever.

In *Peninsular Life Ins. Co. v. Florida Industrial Commission,* 10 So. (2d) (Fla.) 793, the supreme court of Florida held that the three provisions, upon which counsel for the

commissioner rely in this case, of the unemployment compensation act do not supersede the common-law definition of employment, and that the history of the three provisions and the accepted canons of construction do not support the contention that the three provisions supersede the common-law definition of employment. See, also, *Meyer & Co. v. Unemployment Compensation Commission,* 348 Mo. 147, 152 S. W. (2d) 184.

In *Guaranty Mortgage Co. v. Bryant,* 168 S. W. (2d) (Tenn.) 182, it was held that licensed real estate salesmen who were furnished current lists, free office space, telephone, etc., by real estate brokerage firm and received one half of commission earned and actually collected by salesman and closed by firm, did not perform services for firm for wages or under contract of hire within unemployment compensation statutory definition of employment and, therefore, should not be included among firm's employees in determination of applicability of the unemployment compensation statute. See, also, *Wisconsin Bridge & Iron Co. v. Ramsay,* 233 Wis. 467, 290 N. W. 199.

In *Gentile Bros. Co. v. Florida Industrial Commission,* 151 Fla. 857, 10 So. (2d) 568, the alleged employer owned and operated a large citrus fruit-packing house in the state of Florida. The boxes for shipping its products were purchased "knocked down." The packing-house operator contracted with one Hobbs to assemble and load the boxes on cars when packed. Hobbs employed and paid his own help and was responsible to the packing-house operator only as to results. One who had been employed by Hobbs became unemployed. His claim for compensation under the unemployment compensation statute was denied by the Florida industrial commission for lack of earnings in employment. The board of review found contrary to the commission, and that finding was affirmed by the circuit court. The decision was reversed on appeal to the supreme court of Florida, which held that, while the words "employment," "employee," "remuneration," etc., are not used in the statute in a restricted sense and should be liberally construed

to extend the beneficent purpose of the unemployment compensation act, the terms may not be extended to employing units not contemplated by the legislature; that the legislature, when it enacted the unemployment compensation statute, was fully conscious of the master-servant relation as it existed at the common law, and that the distinctions between principal contractor, independent contractor, and servant were well recognized by the law and the courts of Florida. The court held that, as Hobbs represented the packing-house operator as to the results of his work, but not as to the means by which the results were accomplished, Hobbs was an independent contractor, therefore the claimant employed by Hobbs was not an employee of the packing-house operator and was not entitled to unemployment compensation.

To the same effect is *Hill Hotel Co. v. Kinney,* 138 Neb. 760, 295 N. W. 397, in which it was held that, where an orchestra leader was engaged by hotel for specific services at a fixed price, hired his own employees and paid and controlled them in performance of his duties without interference, the orchestra leader was an independent contractor, and hotel company which employed the orchestra was not liable for unemployment compensation for musician employed by the leader. See, also, *Unemployment Compensation Commission v. Mathews,* 56 Wyo. 479, 111 P. (2d) 111.

In *Moorman Mfg. Co. v. Iowa Unemployment etc.,* 230 Iowa 123, 296 N. W. 791, the six months' contract employing salesman on commission in specified territory stated that manufacturing company was interested only in results though salesman was instructed how to approach a sale effectively, including performance of various free services, and was required to file reports and offered bonuses and subjected to inspection to induce greater effort, but salesman could use his own judgment when and how to work and could have other employment. The court held that the salesman was free from control or direction both under contract and in fact, hence there was no "service" or relationship of "employer" and "employee" and the salesman

was not entitled to unemployment compensation. See, also, *Texas Co. v. Wheeless*, 185 Miss. 799, 187 So. 880; *People v. Grier*, 128 P. (2d) (Cal. App.) 207.

In *Northwest Mutual Life Ins. Co. v. Tone*, 125 Conn. 183, 4 A. (2d) 640, 121 A. L. R. 993, it was held that a life insurance company's agents soliciting·applications for policies and compensated by commissions without being supervised or controlled by company respecting place, manner, and time of work are not the insurance company's employees or servants under the Connecticut unemployment compensation act, and that a hirer's unlimited right to discharge a person hired to perform services is not conclusive that latter is a servant, rather than an independent contractor.

In *Meredith Pub. Co. v. Iowa Employment Security Commission*, 232 Iowa 666, 6 N. W. (2d) 6, it was held that one employed as agent to solicit subscriptions on commission basis for magazine published by corporate principal, which did not exercise or have right to exercise control or direction over him as to time, place, method, or character of his work was not such principal's employee but was an independent contractor, therefore not entitled to unemployment benefits under the unemployment compensation act. See, also, *Matter of Miller*, 262 App. Div. 385, 29 N. Y. S. (2d) 15, and *Williams v. United States* (C. C. A. 7th), 126 F. (2d) 129.

In *In re Ten Eyck Co.*, 41 F. Supp. 375, a Federal district court held that a servant is an agent who works under his employer's supervision and direction, while an individual contractor is a person engaged to do certain work but to exercise his own discretion as to mode and time of doing it, and bound by his contract, but not by his employer's orders.

In *Stover Bedding Co. v. Industrial Commission*, 99 Utah 423, 107 P. (2d) 1027, 134 A. L. R. 1006, it was held that, while consideration must be given to the manner and basis of payment in determining whether an individual is an independent contractor or an employee under the unemployment compensation act, that element of payment is by no means conclusive. In the case cited, a deceased salesman

for the bedding company furnished his own means of transportation, paid all his own expenses, and used his own judgment concerning what trips he should make and when he should make them. There was no control or right of control over details of his work as a salesman. He sold for other companies while 'selling for the bedding company. He was not paid a definite, specific salary for his services. Under that evidence, the court held that the salesman was an independent contractor and not an employee of the bedding company. See, also, *Barnes v. Indian Refining Co.*, 134 S. W. (2d) (Ky. App.) 620.

" 'These three factors [in Missouri statute identical with statute of this state] are not given for the purpose of determining whether a certain labor performed or service rendered, comes within the term "employment" as used in the act, nor for determining whether such labor or service is performed for "wages" as used in the act. Subhead 5 applies only to cases, where it has been previously determined, where the work or service comes within the term "employment" as defined in the act, and that it was performed for "wages or under a contract of hire." *Until it has been so determined subhead 5 has no application* (Italics ours). These conditions indicate a legislative intent to make an exception, to eliminate from the operation of the act certain kinds of personal service in private industry rendered for wages, but which could not well be defined by a single work or class designation like those in subdivision 6.' " *Meyer & Co. v. Unemployment Compensation Commission,* 348 Mo. 147, 152 S. W. (2d) 184.

*McDermott v. State,* 196 Wash. 261, 82 P. (2d) 568, is not in point. In that case, we held that licensed barbers plying their trade in a barbershop under an agreed-upon oral lease of barber's chairs in a barbershop owned and operated by the proprietor under an arrangement whereby the lessees of chairs split their earnings with the proprietor on a percentage basis, are employees within the unemployment compensation statutory definition of the relation of master and servant, the so-called oral lease agreements being, in fact, contracts of service, and that "To hold otherwise would be to ignore the realities of the case as disclosed by the respondent's own testimony."

It is clear in that case that the operators were (1) not in fact free from the control or direction of the proprietor; (2) that the service was not rendered outside of the usual course of the proprietor's business or shop; and (3) that the operators were not engaged in an independently established trade of the same nature as that in their course of service.

To the same effect is *State v. Goessman,* 13 Wn. (2d) 598, 126 P. (2d) 201.

In *In re Farwest Taxi Service,* 9 Wn. (2d) 134, 114 P. (2d) 164, it was unnecessary to hold that the unemployment compensation statute had destroyed the common-law concept of master and servant or employer and employee. In that case, appellant solicited the business, designated the driver to answer a specific call, and generally directed the driver's work. Manifestly, under those facts, there was the common-law relationship of master and servant or employer and employee.

Nor was it necessary to hold that the common-law concept of master and servant or employer and employee was destroyed by the unemployment compensation statute in the following cases: *Sound Cities Gas & Oil Co. v. Ryan,* 13 Wn. (2d) 457, 125 P. (2d) 246; *In re Hillman Inv. Co.,* 15 Wn. (2d) 452, 131 P. (2d) 160; and *Unemployment Compensation Department v. Hunt,* 17 Wn. (2d) 228, 135 P. (2d) 89.

A case which has not been overruled and is on all fours with the case at bar (both involving, in fact, a relationship other than that of master and servant or that of employer and employee) is *Washington Recorder Pub. Co. v. Ernst,* 199 Wash. 176, 91 P. (2d) 718, 124 A. L. R. 667, in which we held that the relationship was that of independent contractor and that the unemployment compensation statute did not apply. With charming and commendable frankness, counsel for respondent admit, while not conceding correctness of the opinion, that *Washington Recorder Pub. Co. v. Ernst, supra,* is indistinguishable in principle from the case at bar.

Appellant is no more the "employer" of the oleomargarine

distributors, whose contract with him recites that the parties understand and agree

"that the relation between the Distributor and the Agent shall be that of principal and independent contract [contractor]; that the Distributor shall have no detail supervisory right of the Agent; that the latter shall be at liberty to arrange his work and be responsible only to the Distributor for the result, to the end that the relation of employer and employee shall not exist . . . ."

than was Washington Recorder Publishing Company an "employer" of distributors and carriers of the publishing company's newspapers.

The contention that the oleomargarine representatives of appellant were under his control because the association of each of those representatives with appellant was terminable under the contract at the will of either party, is untenable. This was a voluntary association, and even in the absence of the contract to specifically so recite it was terminable at the will of either party.

Appellant's representatives were no more under and subject to the control of appellant than were the newsboys under the control of the publishing company. Under the contract of the carriers with the publishing company, as under the contract in the case at bar, the association of the carriers with the publishing company, as was the association of appellant's representatives with him, was terminable by either of the contracting parties at any time. The newspaper carriers distributed papers on routes and schedules furnished from time to time by the publishing company. While the contract between the publishing company and its carriers provided for the purchase of the papers from the publishing company at agreed rate per week per paper and payment therefor weekly, the carriers delivered the papers to the purchasers, the customers in their territory, at the price stipulated in the contract. In fact and in law, the relationship of vendor and purchaser between the publishing company and its carriers no more existed than does the relationship of vendor and purchaser exist between appellant and his distributors. The carriers were the con-

duit by or through which the publishing company's commodity (newspapers) was delivered to the subscribers, the purchasers of the newspapers. We knew that the carriers did not purchase the newspapers; the carriers received payment in proportion to the number of subscribers served. True, in principle, the publishing company case is indistinguishable from *McDermott v. State, supra,* where we would not "ignore the realities of the case." In the case at bar, appellant's representatives were independent contractors, through which channel appellant, as vendor, deliverered to the ultimate consumer (the purchaser) the oleomargarine. Whether appellant thereby loses the protection of the commerce clause of the Federal constitution and may be required to pay the state excise on oleomargarine sold within this state, or whether he may thereby evade payment of such excise, is not a matter with which this court should concern itself. It has nothing to do with the legal question presented by this appeal.

In the *Recorder* case, the newsboys were subject to numerous controls, including the territory in which they made delivery of the papers, as to the time they were to commence their work, penalties for inefficient service, etc., and the publishing company could terminate at will its contract with the newsboys. How very similar on the facts to the case at bar. In holding that the degree of control was insufficient, and that the newsboy was not an employee under the unemployment compensation statute, we said:

"The statutory language 'free from control or direction' does not mean that, if the publishing company has any degree of control over the carrier, that the carrier is an employee and not an independent contractor."

The right of appellant and each of his oleomargarine representatives within this state to terminate at will their association one with the other hardly connotes "control" within the meaning of the unemployment compensation statute. If so, appellant and the other party to the contract are each equally subject to the control of the other. Surely, none will seriously argue that the fact that association of

two people is terminable at will of either of the parties establishes control of one over the other.

—ii—

The next exception is that the employment be performed outside the usual course of the business for which such service is performed or that such service is performed outside of all the places of business of the enterprises for which such service is performed. This exception has no application to the facts in the case at bar. In the *Recorder* case, we held that the fact that all the business in connection with the distribution of the papers was done in the publishing company's office, such as deliveries to the carriers, settlements, thrift account deposits, and the like, was not controlling.

—iii—

This exception provides that the individual whom it is sought to bring under the act is customarily engaged in an independently established trade, occupation, profession, or business of the same nature as that involved in the contract of service. The facts in the case at bar and in the *Recorder* case are so similar as to call for application of the same rule in each case. In the case cited, the carriers were prohibited by their contract from taking the agency for, selling, and delivering, any other newspaper. We held that the carriers, in delivering the publishing company's newspapers, were engaged in their own business, independently established.

In *Washington Recorder Pub. Co. v. Ernst, supra,* we stated that obviously the unemployment compensation statute was drafted with the common-law test as its basis, and that in drafting the statute the legislators intended that the common-law test of employment relationship should likewise be a test under the unemployment compensation statute. We observed that the extension of the term "employment" to include independent contractors and others not within the employer-employee relationship, would invite a challenge to the constitutionality of the statute, as the tax [if it is a "tax"] exacted of the employer would be a tax

upon the naked right to contract. We were not then unmindful, nor are we unmindful now, of opinions to the effect that the exaction of a "contribution" like the one in question for the privilege of employing others is an excise tax upon the privilege of employing others. See *Bates v. McLeod*, 11 Wn. (2d) 648, 120 P. (2d) 472, and *Steward Mach. Co. v. Davis*, 301 U. S. 548, 81 L. Ed. 1279, 57 S. Ct. 883, 109 A. L. R. 1293.

In *Unemployment Compensation Department v. Hunt*, 17 Wn. (2d) 228, 135 P. (2d) 89, cited by counsel for respondent, as in *Sound Cities Gas & Oil Co. v. Ryan, supra*, the common-law relation of employer and employee existed, hence the three tests were applicable, as it had previously been determined in each case that the work or service came within the term "employment" as defined in the unemployment compensation statute, and that it was performed for wages or under a contract of hire. Until it has been so determined, the subsection of the statute enumerating the three exceptions has no application.

The unemployment compensation act, like the workmen's industrial insurance act, is highly remedial and beneficent in purpose and should be liberally construed in order to accomplish its evident intent and objective. However, we should not strive by judicial legislation to bring within the purview of either statute that which was not intended or even contemplated by the legislature. The unemployment compensation statute, like the workmen's industrial insurance statute, exacts contribution from each employer for the purpose of creating a fund from which to pay claims coming within the terms of the two statutes. The exaction under each statute is the same in principle. The sums exacted under the industrial insurance statute from the industries for the privilege of operating such industries is not a tax; neither is the contribution exacted under the unemployment compensation statute from employers a tax.

In *Mud Bay Logging Co. v. Department of Labor & Industries*, 193 Wash. 275, 75 P. (2d) 579, it was insisted by the two dissenting judges that the contribution exacted from industry was a license tax. In *State ex rel. Crabb v. Olinger*,

196 Wash. 308, 82 P. (2d) 865, the author of the opinion in which three judges concurred and two judges concurred only in the result, while three judges dissented, endeavored to write into his opinion the dissenting opinion in *Mud Bay Logging Co. v. Department of Labor & Industries, supra,* to the effect that the sums exacted from the several industries are a license tax. That theory, it is manifest, was repudiated. One of the dissenting opinions, with which three of the judges agreed, reads as follows:

"The majority holds that the contributions paid under the workmen's compensation act is a license tax, citing *State ex rel. Davis-Smith Co. v. Clausen,* 65 Wash. 156, 117 Pac. 1101, 37 L. R. A. (N. S.) 466. It is true that reference was made to that question in *Mountain Timber Co. v. Washington,* 243 U. S. 219, 61 L. Ed. 685, 37 S. Ct. 260, Ann. Cas. 1917D, 642, citing the *Clausen* case, *supra.* It will be observed, however, that, in that case, the court did not hold the charge laid upon persons engaged in industries either named in the act or that could be brought under the act, constituted a license tax, but rather that it partakes of the nature of a license tax.

"A tax is defined in 26 R. C. L. 13, to be:

" '. . . an enforced contribution of money or other property, assessed in accordance with some reasonable rule of apportionment by authority of a sovereign state on persons or property within its jurisdiction, for the purpose of defraying the public expenses.'

"The definition of a license tax is contained in 17 R. C. L. 475, as follows:

" 'A license tax is one imposed on the privilege of exercising certain callings, professions, or vocations, that, when collected, goes into the public treasury, and, when applied to municipal taxations, is termed a "license fee." '

"The amounts collected by the department pursuant to provisions of the workmen's compensation act are not taxes, and we have not so held. Such sums are merely sums of money collected by a governmental agency and paid into a trust fund for the sole benefit of those injured workmen falling within the act. The assessments made have none of the characteristics of a license tax. In this connection, we said in *State ex rel. Trenholm v. Yelle,* 174 Wash. 547, 25 P. (2d) 569:

" 'These funds are therefore trust funds drawn from particular sources and devoted to special purposes. By the act itself, the fund is impressed with a trust.

" ' "The fund thereby created shall be termed the 'accident fund' which shall be devoted to the purpose specified for it in this act." Rem. Rev. Stat., § 7676. Re-enacted in Chapter 193, Laws of 1933, p. 925, Rem. 1933 Sup., § 7676

. . .

" 'If the administrative method and the procedure prescribed by the workmen's compensation act be interfered with, the whole purpose of the act may be destroyed. If the legislature may at will appropriate moneys out of those funds regardless of the procedure established by the act, then the act will have lost its effect, and its purpose will be to that extent defeated. The rights of both employer and employee, with reference to the trust funds and their application, will be jeopardized. Those charged with the collection of premiums for the maintenance of the accident fund will have no way of determining what rates shall be fixed or charged. Those who may be entitled to share in the fund by proper procedural compliance will be placed at a disadvantage if the fund be depleted through outside interference. And finally, the legislature will have supplanted the courts as the final arbiter of the legitimacy of claims.'

"The state compels payments by virtue of the exercise of the police power to regulate industry as distinguished from the exercise of the taxing power. The sums paid by the employers are not paid into the treasury for the benefit of the state government as such.

"Since the contributions paid under the workmen's compensation act are not taxes, the case of *State ex rel. Weyerhaeuser Timber Co. v. State Tax Commission*, 189 Wash. 56, 63 P. (2d) 494, is inapplicable here."

The second dissenting opinion, which emphasizes that portion of the first dissenting opinion which points out that the contributions paid by the employers into the accident fund are not license taxes exacted of employers for the mere privilege of engaging in business, reads as follows:

"On the contrary, they are contributions required of and paid by those engaged in extrahazardous industries to meet the burden resting upon them of carrying the greater part of the cost of accidents occurring in such industries; and, when so paid, these contributions constitute trust funds to be devoted to the purposes specified by the workmen's compensation act. The distinction between these two concepts is very important.

"If these contributions be considered merely as 'license taxes,' then, obviously, the employer is concerned only with the payment of his 'tax' in order to engage in business, and he is in no way concerned with the manner in which such 'taxes' are disposed of or distributed by the department among injured employees. The only question that the employer could raise, under that theory, would be whether the tax was reasonable. But the workmen's compensation act by its terms discloses beyond any question of doubt that the employer has a very vital interest in the administration of the accident fund, and that he has the right to be heard before the department and in court upon every claim made by a workman. The employer is not a mere licensee under the act; he is in the position of an assured who, for the premiums that he pays, is entitled to have every just claim arising under the act compensated out of the fund and every spurious claim rejected."

*State ex rel. Crabb v. Olinger,* 196 Wash. 308, 82 P. (2d) 865, was overruled by *St. Paul & Tacoma Lbr. Co. v. Department of Labor & Industries,* 19 Wn. (2d) 639, 144 P. (2d) 250.

The amounts collected pursuant to the provisions of the workmen's compensation statute and the contributions made under the provisions of the unemployment compensation statute, are not taxes. Such sums are merely sums of money collected by a government agency and paid into a trust fund for the sole benefit on the one hand of those injured workmen falling within the act, and on the other hand unemployed persons within the purview of the unemployment compensation statute. As stated in the dissenting opinions in *State ex rel. Crabb v. Olinger, supra,* and approved in *St. Paul & Tacoma Lbr. Co. v. Department of Labor & Industries, supra,* the assessments under the workmen's compensation act have none of the characteristics of a license tax. The assessments made under the unemployment compensation statute differ not in principle from the exactions under the workmen's compensation statute, hence they have none of the characteristics of a license tax.

The opinion of the United States supreme court in *Steward Mach. Co. v. Davis,* 301 U. S. 548, is to the effect that the exaction under the social security act is either an

*excise,* a *duty,* or an *impost* within the intent of Art. I, § 8 of the Federal constitution and complies with the requirement of uniformity throughout the United States; that the enjoyment of common rights, such as the right to employ labor, may constitutionally be taxed; and that no surrender of powers essential to the sovereign existence of the states is required by a section of the social security act which defines the minimum criteria to which a state compensation system is required to conform if it is to be accepted by the social security board as the basis for credits against the taxes laid on employers by the act.

The authors of the dissenting opinions in the foregoing case were more mindful of the constitution of the United. States than those who subscribed to the majority opinion. The language, as follows; of the dissenting opinion of Sutherland, J., should challenge *even now* the elective state judiciary to aid in preserving what remains of state sovereignty:

"But the question with which I have difficulty is whether the administrative provisions of the act invade the governmental administrative powers of the several states reserved by the Tenth Amendment. A state may enter into contracts; but a state cannot, by contract or statute, surrender the execution or a share in the execution, of any of its governmental powers either to a sister state or to the federal government, any more than the federal government can surrender the control of any of its governmental powers to a foreign nation. The power to tax is vital and fundamental, and, in the highest degree, governmental in character. Without it, the state could not exist. Fundamental also, and no less important, is the governmental power to expend the moneys realized from taxation, and exclusively to administer the laws in respect of the character of the tax and the methods of laying and collecting it and expending the proceeds.

"The people of the United States, by their Constitution, have affirmed a division of internal governmental powers between the federal government and the governments of the several states—committing to the first its powers by express grant and necessary implication; to the latter, or to the people, by reservation, 'the powers not delegated to the United States by the Constitution, nor prohibited by it to the States.' The Constitution thus affirms the complete

supremacy and independence of the state within the field of its powers. *Carter v. Carter Coal Co.*, 298 U. S. 238, 295. The federal government has no more authority to invade that field than the state has to invade the exclusive field of national governmental powers; for, in the oft-repeated words of this court in *Texas v. White*, 7 Wall. 700, 725, 'the preservation of the States, and the maintenance of their governments, are as much within the design and care of the Constitution as the preservation of the Union and the maintenance of the National Government.' The necessity of preserving each from every form of illegitimate intrusion or interference on the part of the other is so imperative as to require this court, when its judicial power is properly invoked, to view with a careful and discriminating eye any legislation challenged as constituting such an intrusion or interference. See *South Carolina v. United States*, 199 U. S. 437, 448.

"The precise question, therefore, which we are required to answer by an application of these principles is whether the congressional act contemplates a surrender by the state to the federal government, in whole or in part, of any state governmental power to administer its own unemployment law or the state payroll-tax funds which it has collected for the purposes of that law. An affirmative answer to this question, I think, must be made."

Pertinent, also, is the following language of Mr. Justice Butler in his dissenting opinion:

"I think that the objections to the challenged enactment expressed in the separate opinions of MR. JUSTICE McREYNOLDS and MR. JUSTICE SUTHERLAND are well taken. I am also of the opinion that, in principle and as applied to bring about and to gain control over state unemployment compensation, the statutory scheme is repugnant to the Tenth Amendment: 'The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people.' The Constitution grants to the United States no power to pay unemployed persons or to require the States to enact laws or to raise or disburse money for that purpose. . . .

"The terms of the measure make it clear that the tax and credit device was intended to enable federal officers virtually to control the exertion of powers of the States in a field in which they alone have jurisdiction and from which the United States is by the Constitution excluded."

In so far as our unemployment compensation statute (Laws of 1937, chapter 162) is tied in with and made a part of the Federal social security statute and administered and controlled by the Federal government, it is unconstitutional.

The subscribers to the program to change the fundamental constitutional system of the United States—devotees, if you please, of an alien ideology—are contemptuous of or unfamiliar with the history and the constitution of our country; otherwise, they would not endeavor to effect reforms in contravention of the constitution, which they treat as a mere scrap of paper.

That ameliorative statutes, such as industrial insurance, old age pensions, and unemployment compensation, may be *constitutionally enacted* and *administered by this state,* may not, I am convinced, be successfully challenged.

While I am conscious of the so-called "modern trend" to sweep away constitutional safeguards, aware of court opinions which contribute to a definite and determined program to change our representative republic, and familiar with the proverb that "Tempore ruricolae patiens fit taurus aratri," (Ovid-Trista) I am also mindful of my oath to support the constitution, breach of which psittacism cannot absolve.

Under the uncontroverted facts, and the law applicable thereto, it is plain that appellant's oleomargarine representatives are independent contractors, hence are not within the purview of the unemployment compensation statute.

Nothing, since writing the foregoing when the cause was assigned to the writer for departmental opinion, has been brought to the attention of the court to convince this writer that the views above expressed are unsound.

To affirm the judgment in the case at bar, overrule *Washington Recorder Pub. Co. v. Ernst, supra,* (this was effected by our opinion in *Mulhausen v. Bates,* 9 Wn. (2d) 264, 114 P. (2d) 995), reverse *Curtis v. Riley, post* p. 951, 157 P. (2d) 975, reverse *Broderick, Inc. v. Riley, ante* p. 760, 157 P. (2d) 954, and affirm or reverse *In re Coppage, ante* p. 802, 157 P. (2d) 977, is to continue our period of flux in this

class of cases; in fact, by each succeeding opinion we make confusion worse confounded.

The judgment should be reversed and the alternative writ quashed. Nor do I agree with the holding respecting the question of denial of due process.

SIMPSON, J., concurs with MILLARD, J.

STEINERT, J. (dissenting)—I am of the opinion that this case is controlled by the case of *Broderick, Inc. v. Riley, ante* p. 760, in that the distributors referred to in the majority opinion herein do not perform personal services for the relator and appellant Mulhausen for wages, or remuneration, or under a contract of hire, and are not employed by him, within the purview of the unemployment compensation act. The judgment should therefore be reversed and the writ quashed.

June 23, 1945. Petition for rehearing denied.

